**PICADILLY, INC., Appellant
(Plaintiff Below),**

v.

**Gustin J. RAIKOS and Dennis
L. Thomas, Jr., Appellees
(Defendants Below).**

**No. 41S01–9112–CV–946.**

Supreme Court of Indiana.

Dec. 2, 1991.

W.F. Conour and Rex E. Baker, Conour Doehrman, Indianapolis, for appellant.

John T. Lorenz and Jeffrey A. Doty, Kightlinger & Gray, Indianapolis, for appellees.

SHEPARD, Chief Justice.

This case presents an issue of first impression in Indiana: may a party assign a

legal malpractice claim to someone who was his adversary in the underlying litigation? We hold that such assignments are invalid.

## I. Case History

This appeal concerns a second lawsuit arising out of injuries sustained by Charles Colvin. Colvin had been injured in an automobile wreck caused by a drunken patron of Picadilly's bar in Indianapolis. Colvin sued the patron and Picadilly, Inc. The jury in that case found Picadilly liable for Colvin's injuries; it awarded Colvin $75,000 in compensatory damages and $150,000 in punitive damages. The facts and legal issues raised by that tort suit are more fully set out in *Picadilly Inc. v. Colvin* (1988), Ind., 519 N.E.2d 1217 [*Picadilly I*].

This second round of litigation began in October 1986 when Picadilly, Inc. filed a claim against its attorneys, Gustin Raikos and Dennis Thomas, alleging they committed legal malpractice while defending Picadilly against Colvin's tort suit. Picadilly's complaint alleged that its attorneys' negligence permitted the jury to hear an erroneous instruction on punitive damages, leading to the six-figure punitive damage award. In April 1988, attorneys Raikos and Thomas moved for summary judgment in the malpractice case on grounds Picadilly failed to raise a genuine issue of fact with respect to the question of proximate cause. The trial court granted the attorneys' motion in November 1988.

At some point, Picadilly sought protection from its creditors by filing for reorganization under Chapter 11 of the Bankruptcy Act.

A month after the trial court granted the attorneys' motion for summary judgment, the U.S. Bankruptcy Court confirmed Picadilly's plan of reorganization. This plan included the discharge of Colvin's punitive damage claim, in part through the assignment of Picadilly's malpractice claim against Raikos and Thomas.

Shortly after the assignment, attorney William Conour, who had represented Colvin in the earlier personal injury action, became counsel to the plaintiff in the malpractice case (ostensibly still maintained by Picadilly, though for all that appears Picadilly is no longer the real party in interest). Conour immediately filed a motion to correct errors concerning the entry of summary judgment. In a statement opposing the motion, attorneys Raikos and Thomas argued the assignment of the claim was invalid. The trial court denied the plaintiff's motion to correct errors in July 1989.

The plaintiff appealed, and the Court of Appeals affirmed the summary judgment. *Picadilly, Inc. v. Raikos* (1990), Ind.App., 555 N.E.2d 167. The majority of the court concluded that an assignment to a tort-judgment creditor, received through a bankruptcy proceeding, should be regarded as valid. The majority held that Raikos and Thomas had successfully negated the element of causation necessary to the malpractice complaint and that summary judgment had been properly entered in their favor. Judge Baker concurred in the result, concluding the assignment itself was invalid as against public policy.

Because the assignability of legal malpractice claims is a new question of law, we grant the petition to transfer. Ind. Appellate Rule 11(B)(2)(b). We answer this important question in the negative—legal malpractice claims are not assignable.

## II. The History of Assignability

Because a legal malpractice claim is a chose in action, we begin by reviewing the law generally controlling the assignment of choses in action.[1] Under ancient common law, hardly any chose in action was assignable. 3 S. Williston, *A Treatise on the Law of Contracts* § 405, at 7 (3d ed. 1960) [hereinafter *Williston on Contracts*].

---

1. One definition of a "chose in action" is the "right to receive or recover a debt, demand, or damages on a cause of action *ex contractu* or for a tort or omission of a duty." *Black's Law Dictionary* 219 (5th ed. 1979). Professor Corbin explains the derivation of this phrase and pro-vides a helpful list of examples in his treatise. 4 A. Corbin, *Corbin on Contracts: A Comprehensive Treatise on the Rules of Contract Law* § 859, at 416–17 (1951) [hereinafter *Corbin on Contracts*].

Scholars have postulated various reasons for this rule. Both Lord Coke and Blackstone argued that assignment constituted champerty and maintenance, which were discouraged by the " 'wisdom and policy of the sages and founders of our law.' " 3 *Williston on Contracts* § 404, at 7 (citing *Lampet's Case* (Eng.) 10 Coke, 46a, 48a). *See also Draper v. Zebec* (1941), 219 Ind. 362, 372, 37 N.E.2d 952, 956 ("In Blackstone's time it was thought that many, for the furtherance of pretended rights, conveyed some interest therein to great men in order to gain their support and influence over the courts in the interests of their cause....").[2] Discounting the fear of maintenance, others argued that assignment was barred by the doctrine of privity. Ames, *The Disseisin of Chattels: The Inalienability of Choses in Action*, 3 Harv. L.Rev. 337, 339 & n. 2 (1890) (noting that the rule barring assignments predated laws against maintenance and was justified in other European countries on grounds that such personal rights were non-transferrable). The intangible nature of a chose in action and the lack of commercial necessity are also credited as contributing to the non-assignment rule. 4 *Corbin on Contracts* § 856, at 403.

Whatever the reason for this rule, over the centuries a variety of forces combined to work its slow reversal. The chose in action based on contract was the first to become assignable, primarily out of economic necessity. Competition between courts of equity and law, and assignees' creative use of the power of attorney also contributed. *Id.*, at 404–08. The assignment of choses in action based on tort gained judicial acceptance more slowly. With the de-emphasis of privity, the passage of English statutes, and the demise of laws against champerty, choses in action for torts against personal property slowly gained the power of assignment. The assignment of tort suits growing out of an injury to the person, however, or for

wrongs done to the person, reputation, or feelings of the injured party, continued to be held unassignable. Today, the non-assignability of a chose in action has become so restricted that it is now the exception to the rule of free assignment. *Essex v. Ryan* (1983), Ind.App., 446 N.E.2d 368, 374. Contract-based choses in action have been deemed assignable, except for contracts which are purely personal in nature (like marriage contracts). *Id.* at 374 n. 3. Tort-based choses in action are assignable if they arise out of injuries to personal property; torts for personal injuries and for wrongs done to the person, reputation, or feelings of the injured party remain unassignable. Annotation, *Assignability of Claim in Tort for Damages to Personal Property*, 57 A.L.R.2d 603, 606 (1958) ("few legal principles are as well settled ... as the rule that the common law does not permit assignments of causes of action to recover for personal injuries"); Annotation, *Assignability of Claim for Personal Injury or Death*, 40 A.L.R.2d 500, 502 (1955); 4 *Corbin on Contracts* § 857, at 411; *Methodist Hospital v. Town & Country Mut. Ins. Co.* (1964), 136 Ind.App. 184, 192, 197 N.E.2d 773, 776–77.

The common law in most states today, including Indiana, teaches that any chose in action that survives the death of the assignor may be assigned. " '[A]ny cause or right of action may be assigned that, in accordance with the rules relating to the survivability of causes of action ... would, on the death of the assignor, survive to his legal representative.' " *Armstrong v. Illinois Bankers Life Ass'n* (1940), 217 Ind. 601, 619, 29 N.E.2d 415, 422 (quoting 6 C.J.S. § 30, at 1079). An English statute on the survival of actions enacted in 1330 is responsible for this connection between survival and assignment.[3] The interpretation of this statute over the centuries eventually led courts to view assignment and

---

**2.** Overruled in part, *O'Donnelly v. Krneta* (1958), 238 Ind. 582, 154 N.E.2d 45.

**3.** 4 Edward 3, chap. 7 (1330). That statute permitted the executor of a decedent's estate to sue on actions for trespass to chattels owned by the

decedent. Courts interpreting this statute came to view the executor as the assignee of the decedent's chose in action. *See* Annotation, 57 A.L.R.2d at 605 & 619.

survival as "convertible propositions." *Zabriskie v. Smith*, 13 N.Y. 322, 334 (1855).

As one might expect, this rule derived from an English statute enacted more than a century before the invention of movable type is not tightly enforced. Some state courts, like the Illinois Supreme Court, have expressly stated that although survival is the usual test for assignability, it is not the only test. *North Chicago St. R.R. v. Ackley*, 171 Ill. 100, 49 N.E. 222 (1897).

### III. Assignability and Public Policy

Today, it seems anachronistic to resolve the issue of the assignability of a legal malpractice claim by deciding whether such a claim would survive the client's death. The parties to this litigation have not even briefed the survival issue. As is sometimes the case with the common law, the rule has outlived the reason for its creation. "The customs, beliefs, or needs of a primitive time establish a rule or a formula. In the course of centuries the custom, belief, or necessity disappears, but the rule remains." O.W. Holmes, *The Common Law* 5 (1881). Where such is the case, this Court has been willing finally to "reexamine the basis of the rule." *Campbell v. State* (1972), 259 Ind. 55, 58, 284 N.E.2d 733, 734.

Assignment should be permitted or prohibited based on the effect it will likely have on modern society, and the legal system in particular. This is a question properly within our purview as common law judges, but it is particularly appropriate for this Court to fashion a new rule based on public policy because the Indiana Constitution vests us with exclusive original jurisdiction over matters relating to the practice of law. Ind.Const. art. VII, § 4.

The difficulty that other state courts have experienced in trying to apply the survival test reinforces the correctness of our decision to look first to public policy. Courts in at least eleven states have considered the question before us today. Seven have refused to permit assignment,[4] only four permit it.[5]

Most of these courts have acknowledged that the common law links assignment to survival. A few explore whether a legal malpractice claim actually survives the death of a client. Most skip this issue, and instead compare a legal malpractice claim to those tort and contract actions for which assignment is a matter of settled law. These courts usually conclude that a legal malpractice claim resembles both a claim arising out of a contract for personal services—which is not assignable—and a claim based on tortious injury to personal property—which is assignable. *See, e.g., Christison*, 83 Ill.App.3d at 338, 39 Ill.Dec. at 562, 405 N.E.2d at 10. *But see Schroeder*, 142 Ariz. at 399, 690 P.2d at 118 (legal malpractice claims are tort claims subject to two year statute of limitations for personal injuries and are not assignable); *Hedlund*, 517 Pa. at 526, 539 A.2d at 359 (rights involved in legal malpractice claim akin to property rights that can be assigned).

Nearly all these courts found the survival test inconclusive and ultimately turned to public policy. In the first case to address the issue head-on, the California Court of Appeals gave a relatively concise recitation of the many public policy issues involved:

**4.** *Goodley v. Wank & Wank, Inc.*, 62 Cal.App.3d 389, 133 Cal.Rptr. 83 (1976); *Coffey v. Jefferson County Bd. of Educ.*, 756 S.W.2d 155 (Ky.Ct.App. 1988); *Joos v. Drillock*, 127 Mich.App. 99, 338 N.W.2d 736 (1983); *Schroeder v. Hudgins*, 142 Ariz. 395, 690 P.2d 114 (Ct.App.1984); *Washington v. Fireman's Fund Ins.*, 459 So.2d 1148 (Fla. Dist.Ct.App.1984); *Chaffee v. Smith*, 98 Nev. 222, 645 P.2d 966 (1982) (assignment invalid where assignor had not initiated suit prior to making assignment); *Christison v. Jones*, 83 Ill. App.3d 334, 39 Ill.Dec. 560, 405 N.E.2d 8 (1980) (bankruptcy trustee may not pursue debtor's legal malpractice claim). *But see Roth v. Stogsdill*, 210 Ill.App.3d 659, 155 Ill.Dec. 34, 569 N.E.2d 34 (1991) (suggesting that *Christison* had been superseded by revision of the federal bankruptcy law in 1978).

**5.** *Collins v. Fitzwater*, 277 Or. 401, 560 P.2d 1074 (1977) (reversed on other grounds by *Lancaster v. Royal Ins. Co. of America*, 302 Or. 62, 726 P.2d 371 (1986)); *American Hemisphere Marine Agencies, Inc. v. Kreis*, 40 Misc.2d 1090, 244 N.Y.S.2d 602 (N.Y.Sup.Ct.1963); *Hedlund Mfg. v. Weiser, Stapler & Spivak*, 517 Pa. 522, 539 A.2d 357 (1988); and *Thurston v. Continental Casualty*, 567 A.2d 922 (Me.1989).

The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty, and who have never had any prior connection with the assignor or his rights. The commercial aspect of assignability of choses in action arising out of legal malpractice is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandizing such causes of action is the lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers. The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client.

*Goodley v. Wank & Wank, Inc.*, 62 Cal. App.3d at 397, 133 Cal.Rptr. at 87.

Our own conclusion that legal malpractice claims should not be assigned is based on our general agreement with *Goodley*, and our particular concern about two issues: the need to preserve the sanctity of the client-lawyer relationship, and the disreputable public role reversal that would result during the trial of assigned malpractice claims like this one.

### IV. The Client–Lawyer Relationship

The client-lawyer relationship, which is defined by the Indiana Rules of Professional Conduct, exists to advance the interests of the client, not the lawyer.[6] Once created, this relationship places a multitude of duties on the lawyer. An attorney who breaches any of these duties may face both disciplinary action and a legal malpractice claim. These Rules and this Court's willingness to enforce them help ensure that the public is well served by the bar. Forces that undermine the standards on which the Rules of Professional Conduct are founded disserve the public by weakening the client-lawyer relationship. We believe the free assignment of legal malpractice claims would do just that. Assignment of legal malpractice claims would weaken at least two standards that define the lawyer's duty to the client: the duty to act loyally and the duty to maintain client confidentiality.

### A. The Duty to Act Loyally

The assignment of a legal malpractice claim is perhaps most incompatible with the attorney's duty of loyalty. An attorney's loyalty is likely to be weakened by the knowledge that a client can sell off a malpractice claim, particularly if an adversary can buy it. If an attorney is providing zealous representation to a client, the client's adversary will likely be motivated to strike back at the attorney in any permissible fashion. If an adversary can retaliate by buying up a client's malpractice action, attorneys will begin to rethink the wisdom of zealous advocacy. A legal system that discourages loyalty to the client, disserves that client. While attorneys probably remain protected from their client's opponents as long as they please their client, even happy client relationships have been known to spawn malpractice claims. *See Christison*, 83 Ill.App.3d 334, 339, 39 Ill.Dec. 560, 563, 405 N.E.2d 8, 11 (trustee of estate of a happy but bankrupt

---

**6.** Indeed, the very use of the phrase "client-lawyer" rather than the more common phrase "lawyer-client" in the Rules of Professional Conduct reflects the drafters' intention to place the interests of the client above all other considerations. The fact that the Rules define the client-lawyer relationship first, and then define the attorney's relationships with third parties reinforces this intent. 1 G. Hazard & W. Hodes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct* 1 (2d ed. 1990).

client brought malpractice action against bankrupt's attorney).

If assignments were permitted, we suspect that they would become an important bargaining chip in the negotiation of settlements—particularly for clients without a deep pocket. An adversary might well make a favorable settlement offer to a judgment-proof or financially strapped client in exchange for the assignment of that client's right to bring a malpractice claim against his attorney. Lawyers involved in such negotiations would quickly realize that the interests of their clients were incompatible with their own self-interest. The court in Washington has suggested that attorneys representing such clients would be bound by loyalty to sacrifice their own hides (and the deep pockets of their malpractice insurance carriers) in order to secure a favorable settlement for their client.[7]

### B. The Duty to Maintain Confidentiality

An attorney's duty to maintain the confidences of a client is also threatened by the assignment of legal malpractice claims. Whenever an attorney is sued by a client, the attorney is permitted to reveal confidential client information reasonably necessary to establish a defense. Ind. Professional Conduct Rule 1.6(b)(2). So long as the client retains control over the suit, the scope of the disclosure can be limited by the client's power to drop the claim. Once the client assigns the claim, however, the client's control over the litigation is lost, but the attorney's right to defend himself or herself by revealing client information

survives. The client is relegated to observing from the sidelines as the assignee pursues the attorney. If the attorney reasonably responds to the assignee's claim by revealing information the client would have preferred remain confidential, the client cannot prevent the attorney's disclosures. Clients who anticipate this possibility would be no better off than those who are blind-sided by it. Far-sighted clients would be encouraged to withhold damaging information from their attorney in order to preserve their ability to sell off a malpractice claim without the fear of losing control over that information.

This result erodes the principles fostered by the duty of confidentiality.

Rules which discourage an attorney from acting loyally and confidentially toward a client should not be erected without very good cause. Some argue that allowing malpractice claims to be sold on the market would increase their value and promote more such lawsuits.[8] An increase in malpractice claims, they argue, would better discipline the bar. There is no evidence to suggest, however, that the threat of client-driven malpractice claims does not already affect lawyer behavior. Free assignment of malpractice claims might add marginally to the efficiency of collecting on such claims, but it would also do harm in countless other client-lawyer relationships in which no malpractice has occurred.

Unlike any other commercial transaction, the client-lawyer relationship is structured to function within an adversarial legal system. In order to operate within this system, the relationship must do more than bind together a client and a lawyer. It must also work to repel attacks from legal

---

**7.** While the Supreme Court was right by definition in holding that a district court had authority to approve the sort of settlement tendered by the parties in *Evans v. Jeff D.*, the problems created for the client-lawyer relationship have not gone unnoticed. *See Evans v. Jeff D.*, 475 U.S. 717, 739 n. 31, 106 S.Ct. 1531, 1543 n. 31, 89 L.Ed.2d 747 (1986); *id.* at 754–59, 106 S.Ct. at 1551–54 (Brennan, J., dissenting). In a civil rights lawsuit, plaintiffs' attorney's decision to recommend that indigent clients accept settlement offer which contained a waiver of clients' statutory right to attorney fees, but which was otherwise favorable to the clients, was "consist-

ent with the highest standards of the profession." *Evans v. Jeff D.*, 475 U.S. at 728, 106 S.Ct. at 1538. We think the legal system should seek to limit the occasions on which these choices arise.

**8.** This is likely true but not necessarily beneficial. *See* Schmitt, *One Man's Obsession Ties Up the Courts—Until He's Murdered*, Wall St. J., April 22, 1991, at 1, col. 2. The deceased maintained his eight-year vendetta against a California family by buying up various claims others had against the family. The Ninth Circuit declared that this campaign was "not, by any means, a legitimate use of the judicial process."

adversaries. Those who are not privy to the relationship are often purposefully excluded because they are pursuing interests adverse to the client's interests. For example, Picadilly's relationship with attorneys Raikos and Thomas was maintained for one purpose—to defeat Colvin's tort suit against Picadilly. To say that Colvin was not part of Picadilly's client-lawyer relationship throws too benevolent a light on Colvin's true role as Picadilly's adversary. Colvin, after all, was the antagonist who drove Picadilly to seek out the protection offered by the client-lawyer relationship.[9]

### V. The Disreputable Effects of Trial

Our decision to bar the assignment of these claims is also grounded on a highly practical consideration: the trial of this assigned malpractice claim would feature a public and disreputable role reversal. The mechanics of trying this case would magnify the least attractive aspects of the legal system.

To prove a legal malpractice claim, a plaintiff-client must show:

1. employment of the attorney (the duty);
2. failure by the attorney to exercise ordinary skill and knowledge (the breach);
3. proximate cause (causation); and
4. loss to the plaintiff (damages).

*Schneider v. Wilson* (1988), Ind.App., 521 N.E.2d 1341, 1343.

To prove causation and the extent of the harm, the client must show that the outcome of the underlying litigation would have been more favorable but for the attorney's negligence. This proof typically requires a "trial within a trial." *See, e.g.,* 2 R. Mallen & J. Smith, *Legal Malpractice* 641 (3d ed. 1989). Where the attorney's alleged act of malpractice occurred at trial,

as is the situation here, the entire course of events at the first trial becomes relevant to the malpractice claim. In this case, the trial within a trial would consist of the representation of the evidence and argument given in *Picadilly I*. The only change permitted would be in the jury instructions on punitive damages which Picadilly claims erroneously led to the punitive damage award. *See id.* at 643. In *Picadilly I*, of course, Colvin bore the burden of proving Picadilly was liable for his injuries. Colvin took a very clear position to meet this burden. Every pleading filed, every witness called, and every argument made on Colvin's behalf was designed to lead the trier of fact to this conclusion. Colvin's attorney, William Conour, argued in his opening statement that Picadilly's manner of dispensing drinks cafeteria style "manufacture[d] drunks." Record at 240, *Picadilly I*. In his closing argument, Conour eloquently asked the jury to assess punitive damages against Picadilly for the manner in which it sold alcohol:

You will be instructed by the court that you have the authority in this case to award punitive damages against Picadilly's for this unregulated warehouse of alcohol and this assembly line procedure. It's your decision. It's your choice, as members of the community whether or not to allow that type of conduct to continue or whether you can stand up and be counted and help stop the carnage and death that happens on the highways as a result of this type of intoxication.... And this bar, this Piccadilly's is the most irresponsible of all.... And Chad [Colvin] is entitled to compensatory damages for him. But those punitive damages, they're for us. They're for our future.

Record at 847–48, 872–73.

In *Picadilly II*, Colvin and his lawyer Conour must necessarily bear the burden

9. To be sure, the Rules of Professional Conduct also place burdens on the lawyer with respect to dealings with non-clients. The Rules define an attorney's duty to witnesses, the court, opposing parties, opposing counsel, and the public at large. The breach of any of these duties can result in disciplinary action. A lawyer's improper conduct toward a third party can also lead to a malpractice claim or other civil action. *See Shideler v. Dwyer* (1981), 275 Ind. 270, 417 N.E.2d 281 (attorney can be liable to disappointed beneficiary of negligently drawn will). Our concern with the assignment of legal malpractice cases is not motivated by a desire to give lawyers the freedom to ignore their obligations to non-clients. We view the Rules of Professional Conduct and the law of legal malpractice as shields to protect both clients and non-clients.

of proving a proposition directly contrary to the proposition they successfully proved in *Picadilly I.* They now assert that it was Picadilly's attorneys, and not Picadilly's manner of selling alcohol, that led the jury to award $150,000 in punitive damages. Because of the unique nature of the trial within a trial, Colvin's change in position would be obvious to all the jurors hearing the evidence in *Picadilly II.* They would rightly leave the courtroom with less regard for the law and the legal profession than they had when they entered.[10]

### VI. Conclusion

All things considered, we see the disadvantage of assignments outweighing the advantages. The question in this case is not whether clients should be able to make claims against lawyers for malpractice. The question is whether to allow clients to sell off their claims for pursuit by others.

We affirm the trial court's grant of summary judgment for attorneys Raikos and Thomas on grounds that the assignment of Picadilly's malpractice claim to Colvin was invalid as against public policy.

DeBRULER, GIVAN and DICKSON, JJ., concur.

KRAHULIK, J., concurs in result without separate opinion.

---

**10.** Shifts in position are inevitable as long as clients are allowed to bring malpractice claims, and attorneys are permitted *to* fight them. The attorney defending against a legal malpractice claim undoubtedly shifts positions as well. In making this shift, however, the attorney changes roles, too. In the underlying litigation, attorneys Raikos and Thomas functioned as advocates. In this malpractice action, they are now party-defendants. Moreover, Raikos and Thomas do not now bear the burden of affirmatively disproving that which they have already proved.