SHEPARD, Chief Justice.
In this motor vehicle collision case, defendant’s insurance carrier offered to pay policy limits even as it continued to defend its insured. Plaintiff refused the offer. A jury awarded damages above policy limits, and the carrier immediately paid on its policy.
In proceedings supplemental, the trial court ordered the insured to assign any cause of action he might have against his insurer and directed plaintiffs counsel to prepare the assignment. The assignment became a global one, which plaintiff deployed to sue both the carrier and defendant’s personal attorney. We held fifteen years ago, however, that assigning claims against lawyers is impermissible. Most of the reasons for that rule also pertain to involuntary assignments such as the one before us.
Facts and Procedural History
James Perkins was driving his pickup truck through Columbus, Indiana, when he hit the rear of Dan Estep’s motorcycle. Estep suffered devastating injuries.[1] In *1023 August 2000, Estep filed a personal injury-action against Perkins.
Perkins’ insurer, State Farm Mutual Automobile Insurance Company, retained attorney Michael Stephenson to defend him. Perkins also retained his personal attorney, Jerry L. Susong, as Stephenson’s co-counsel. Estep died before trial, and his Estate was substituted as plaintiff.
Perkins’ automobile policy with State Farm had a $50,000 per person policy limit. State Farm repeatedly offered to pay Estep the $50,000 policy limit, but Estep refused to accept the offer or submit a demand.
Estep’s claim went to trial, and in March 2002 the jury awarded Estep’s Estate $650,000 in compensatory damages and $15,000 in punitive damages. The day after the verdict, State Farm paid Perkins’ full policy limit of $50,000 to the Estate.
In April 2002, pursuant to Trial Rule 69(E), the Estate initiated proceedings supplemental to execution against Perkins, seeking satisfaction of the $615,000 that remained unpaid.[2]
Stephenson withdrew in July 2002, concluding he had completed his defense obligations under Perkins’ insurance policy. Susong continued to represent Perkins. Subsequent to Stephenson’s withdrawal, the Estate sought an order directing Perkins to assign to it any cause of action Perkins might have against State Farm. State Farm was not a party to the proceedings supplemental and did not receive
notice that the Estate was seeking the assignment.[3]
When requested to assign any potential bad faith claim he might have against State Farm, Perkins refused and denied that there was any basis for such a claim. Susong said on Perkins’ behalf that State Farm
defended [Perkins] all the way through. I personally would not ... open[ ] the insurance company up to defending another case that their own insured does not wish to bring, without some showing of fact that they did do something.... I’m not aware of any bad faith dealing on [State Farm’s] part[ ].
(Hr’g Tr. at 7.)
Over Perkins’ objection, the court ordered Perkins to assign to the Estate any potential bad faith claim Perkins might have against State Farm. The assignment Perkins presented turned out to be even broader. It assigned to the Estate all potential “claims, demands, and cause or causes of action” arising out of the Estate’s personal injury action against Perkins, including a specific assignment of any potential cause of action against State Farm.
State Farm first received notice of the assignment in September 2003, when the Estate, as Perkins’ assignee, sued State Farm in an Illinois state court asking $615,000 in damages — the amount by which the Indiana judgment against Perkins exceeded his insurance coverage.[4] *1024 The complaint alleged that State Farm breached its duty of good faith owed to Perkins by failing to provide Perkins with a conflict-free defense. Asked at oral argument what indication there was that State Farm had acted in bad faith, counsel replied that there was an insurance policy, that it facially covered the claim, and that a judgment was entered against the insured.[5]
The Estate also sued Perkins’ personal attorney Susong in the Illinois complaint, claiming Susong “actively-participated” in Perkins’ defense and should have alleged to Perkins that Stephenson had a conflict of interest. Stephenson was not named as a defendant.
State Farm then moved to intervene in the Indiana proceedings supplemental and asked that the order compelling Perkins’ assignment be vacated. The trial court denied both motions without comment or findings. State Farm appealed from these denials.
The Court of Appeals held that State Farm was entitled to notice and an opportunity to intervene in the proceedings supplemental. State Farm Mut. Auto. Ins. Co. v. Estep, 818 N.E.2d 114, 125-26 (Ind.Ct.App.2004).[6] The Court of Appeals further held that a court hearing a proceeding supplemental could force assignment of any claim Perkins had against State Farm, but only if the court first determined that a viable claim existed. Id. We granted transfer. State Farm Mut. Auto. Ins. Co. v. Estep, 831 N.E.2d 748 (Ind.2005).
I. Assignability in General
Under early common law, hardly any chose in action was assignable. 3 Samuel Williston, A Treatise on the Law of Contracts § 405, at 7 (3d ed.1960). Both Lord Coke and Blackstone argued that assignment constituted champerty and maintenance, which were discouraged by the “ ‘wisdom and policy of the sages and founders of our law.’ ” Id. (quoting Lampet’s Case (Eng.) 10 Coke, 46a, 48a). See also Draper v. Zebec, 219 Ind. 362, 372, 37 N.E.2d 952, 956 (1941) (“In Blackstone’s time it was thought that many, for the furtherance of pretended rights, conveyed some interest therein to great men in order to gain their support and influence over the courts in the interests of their *1025 cause.”).[7] Discounting the fear of maintenance, others argued that assignment was barred by the doctrine of privity. J.B. Ames, The Disseisin of Chattels: Inalienability of Choses in Action, 8 Harv. L.Rev. 337, 339 & n. 2 (1890) (noting that rule barring assignments predated laws against maintenance and was justified in other European countries on grounds that such personal rights were non-transferable). The intangible nature of a chose in action and the lack of commercial necessity are also credited as contributing to the non-assignment rule. 4 Arthur Corbin, Corbin on Contracts: A Comprehensive Treatise on the Rules of Contract Law § 856, at 403 (1963).
Whatever the reason for this rule, a variety of forces combined over the centuries to work its slow reversal. The chose in action based on contract was the first to become assignable, primarily out of economic necessity. Next, with the de-em-phasis of privity, the passage of English statutes, and the demise of laws against champerty, choses in action for torts against personal property slowly gained the power of assignment. The assignment of tort suits growing out of an injury to the person, however, or for wrongs done to the person, reputation, or feelings of the injured party, remained unassignable.
The common law in most states today, including Indiana, teaches that any chose in action that survives the death of the assignor may be assigned. “ ‘[A]ny cause or right of action may be assigned that, in accordance with the rules relating to the survivability of causes of action ... would, on the death of the assignor, survive to his legal representative.’ ” Armstrong v. Ill. Bankers Life Ass’n, 217 Ind. 601, 619, 29 N.E.2d 415, 422 (1940) (quoting 6 C.J.S. Assignments § 30). An English statute on the survival of actions enacted in 1330 is responsible for this connection between survival and assignment.[8] As one might expect, this rule derived from an English statute enacted more than a century before the invention of movable type is not tightly enforced.
It seems anachronistic today to resolve the issue of assignability of a chose in action by deciding whether such a claim would survive the client’s death. Instead, as we said in Picadilly, Inc. v. Raikos, 582 N.E.2d 338, 341 (Ind.1991), “Assignment should be permitted or prohibited based on the effect it will likely have on modern society, and the legal system in particular.” This is a question properly within our purview as common law judges.
II. Legal Malpractice Chose in Action
In Picadilly, we held that legal malpractice claims are not assignable. Two primary policy concerns drove that conclusion: “the need to preserve the sanctity of the client-lawyer relationship, and the disreputable public role reversal that would result during the trial of assigned malpractice claims.” Id. at 342. We observed that assigning such claims would almost certainly result in the “merchandizing [of] such causes of action ... which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force *1026 attorneys to defend themselves against strangers.” Id. Balancing the advantages and disadvantages of such assignments, we barred assignment of 'legal malpractice claims, noting clients may still make these claims directly against their attorneys, but they cannot assign their choses in action. Id. at 345.
Perkins signed a general assignment to the Estate that included an assignment of any claim Perkins might have against his personal attorney Susong. The Estate then used the assignment to sue Susong, alleging negligence and brehch of duty to defend Perkins. The complaint contended that Susong breached his duty of care owed to Perkins by failing to inform him that Stephenson had a conflict and by failing to require State Farm to appoint alternative counsel.
Although Perkins could directly file a complaint against Susong, or Stephenson for that matter, Perkins cannot assign this opportunity against either of his attorneys. As we explained in Picadilly, such assignments would likely be very harmful to the lawyer-client relationship. 582 N.E.2d at 345.[9] Perkins’ , assignment of this claim is invalid.
III. Insured’s Chose in Action Against Insurer
To be sure, an insured may directly assert a claim against án insurer for breach of the duty of good faith. Erie Ins. Co. v. Smith ex rel. Hickman, 622 N.E.2d 515, 519 (Ind.1993) (“recognition of a cause of action for the tortious breach of an insurer’s duty to deal with its insured in good faith is appropriate”). This duty and resulting cause of action arise out of the insurance contract between the insured and the insurer. Menefee v. Schurr, 751 N.E.2d 757, 760 (Ind.Ct.App.2001) (tort arises from “special relationship” between insured and insurer).
On the other hand, like virtually every other American jurisdiction, Indiana follows the Direct Action Rule, prohibiting a third party or judgment creditor from directly suing a judgment debtor’s insurance carrier to recover an excess judgment. See, e.g., City of South Bend v. Century Indem. Co., 821 N.E.2d 5, 9-10 (Ind.Ct.App.2005) (“The ‘direct action rule’ bars a party from pursuing a claim based oh the actions of an insured directly against the insurer.”);[10] Menefee, 751 N.E.2d at 761 (any excess liability of insurance carriers arises out of relationship between insurer and insured, and insurance carrier owes no duty to third party); Bennett v. Slater, 154 IndApp. 67, 289 N.E.2d 144 (1972) (possible tort action available for insured to sue insurer directly, not available to third party).
The direct action rule is so widely embraced as the result of shared conclusions about the adverse consequences flowing from third parties suing carriers directly. Menefee, 751- N.E.2d at 761 n. 2 (noting, in *1027 2001, all but four states followed the direct action rule). The California Supreme Court once abandoned the direct action rule, then reversed itself after a decade of “adverse social and economic consequences.” Moradi-Shalal v. Fireman’s Fund Ins. Co., 46 Cal.3d 287, 250 Cal.Rptr. 116, 758 P.2d 58, 66-68 (Cal.1988) (overruling Royal Globe Ins. Co. v. Superior Court, 23 Cal.3d 880, 153 Cal.Rptr. 842, 592 P.2d 329 (1979)). The California court concluded that permitting third-party direct actions against insurance companies promoted multiple-litigation, unwarranted settlement demands, escalating insurance costs, and serious conflicts of interest between the insureds and their insurers:
[Allowing direct suits by third parties] promotes multiple litigation, because ... [it] encourages ... two lawsuits by the injured claimant: an initial suit against the insured, followed by a second suit against the insurer for bad faith refusal to settle_ [It also] encourage[s] unwarranted settlement demands by claimants, and ... coerce[s] inflated settlements by insurers seeking to avoid the cost of a second lawsuit and exposure to a bad faith action.... [It may also lead to] escalating insurance costs to the general public resulting from insurers’ increased expenditures to fund coerced settlements.... [Finally it] create[s] a serious conflict of interest for the insur-' er, who must not only protect the interests of its insured, but also must safeguard its own interests from the adverse claims of the third party claimant. This conflict disrupts the settlement process and may disadvantage the insured.
Id. at 66-67 (citations omitted).
Our Court of Appeals correctly recognized that involuntary assignment of claims against carriers whose insureds do not believe they have been wronged by their insurance companies was inconsistent with the direct action rule. And it would produce roughly the same results.
First, permitting these forced assignments would certainly result in multiple litigation, as it would understandably become ordinary practice for judgment creditors to pursue insureds’ insurance carriers where insureds cannot themselves fulfill the judgment.
Second, these assignments would change adversely the dynamic in settlement negotiations. A new consideration in the bargaining — and one that would affect whether people choose to exercise their right to trial — would be the possibility of an excess coverage claim and the cost of litigating it, even successfully. This realistic concern would exacerbate potential conflicts of interest between the insured and the insurer, as the insurer would be forced to greater vigilance in the course of simultaneously protecting both its interest and the insured’s interest.
Third, the increased risk and cost would be borne by insureds who never make a claim and found their insurance service satisfactory. Allowing judgment creditors to force assignments in an attempt to recover judgments above the insured amount would render meaningless the bargains made in the marketplace between millions of insureds and hundreds of insurers about the amounts of policy coverage and the premiums necessary under standard underwriting principles to cover those policy amounts.
This case illustrates sharply how consumer agreements between insureds and their insurers would be disregarded as judgment creditors attempt to recover amounts not insured for. Perkins and State Farm agreed to á $50,000 policy, and Perkins — and other consumers — paid premiums based on State Farm’s calculation of risk. State Farm repeatedly offered to pay full policy limits to the Estate, and *1028 indeed, paid policy limits the day after judgment. Nonetheless, the Estate forced an assignment of Perkins’ alleged cause of action against State Farm in an attempt to recover an additional $615,000. The $615,000- excess judgment was clearly not part of State Farm’s bargained-for risk based on a $50,000 consumer agreement.
More importantly, however, State Farm’s increased risk would affect more than just Perkins’ premiums. It would affect all the drivers who never experience a collision, drivers who think they are paying for a stated amount of coverage. Théir real coverage would extend to some higher number that is sufficient to cover excess payouts and, of course, additional legal costs associated with litigating the proper amount of the payout above the stated limits. In effect, drivers who never have an accident would have to pay additional premiums to cover the requests of claimants who think the insureds’ carriers did not do as good a job for the insureds as the insureds themselves think they did.
The trial court’s order requiring Perkins’ forced assignment of his chose in action against State Farm was error. This does not in any way prohibit Perkins from directly suing State Farm or from voluntarily assigning his chose in action.[11]
Conclusion
We reverse the order issued during proceedings supplemental forcing Perkins’ assignment of any potential chose in action against State Farm and hold invalid' any assignment by Perkins against his attorneys.
SULLIVAN and RUCKER, JJ., concur.
BOEHM, J., concurs and dissents with separate opinion in which DICKSON, J., joins.

. As a result of this collision, Perkins was convicted of operating a vehicle while intoxicated causing serious bodily injury, a class D *1023 felony. See Perkins v. State, 812 N.E.2d 836, 837 (Ind.Ct.App.2004).

. In accordance with standard practice, the Estate filed these proceedings supplemental in the same court and under the same cause number as the original proceeding against Perkins. (Appellant's App. at 66, 70-71.)

. At the time of Stephenson’s withdrawal, there was no indication that Perkins had any claim against State Farm or that the Estate sought assignment of any potential claim against State Farm.

.Since a proceeding supplemental is merely an extension of the underlying action, the merits of any assigned claim should not be tried in this limited forum. See First Bank of Whiting v. Sisters of Mercy Health Corp., 545 N.E.2d 1134, 1141 (Ind.Ct.App.1989) (pro *1024 ceeding supplemental not appropriate forum to try a judgment creditor's cause of action against a garnishee-defendant); Protective Ins. Co. v. Steuber, 175 Ind.App. 139, 370 N.E.2d 406.(1977) (garnishee entitled to change of venue where trial likely).,

. The complaint also alleged fraud, constructive fraud, and breach of contract against State Farm. All counts relied on State Farm’s alleged failure to provide Perkins a conflict-free defense. The claim of conflict rested on Stephenson's unsuccessful attempt to withdraw his representation after he had trouble gaining Perkins’ attendancé at hearings. Stephenson's motion to withdraw was denied on October 8, 2001, and Stephenson continued to prepare for trial.

. We agree that State Farm should have been permitted to intervene. The Court of Appeals concluded State Farm had a right to intervene pursuant to Trial Rule 24(A), but we conclude instead that State Farm should have been permitted to intervene pursuant to Rule 24(B). A party may be permitted to intervene "when an applicant’s claim or defense and the main action have a question of law or fact in common.” Ind. Trial Rule 24(B)(2). Perkins argued during the proceedings supplemental that he had no basis for any bad faith claim against State Farm and thus had nothing to assign. (Appellant's App. at 130.) Upon receiving notice of the assignment, State Farm moved promptly to intervene in the proceedings supplemental, advancing an identical defense as regards the involuntary assignment. (Id. at 124-27.)

. Overruled in part, O’Donnell v. Krneta, 238 Ind. 582, 154 N.E.2d 45 (1958).

. 4 Edw. 3, c. 7 (1330). That statute permitted the executor of a decedent's estate to sue on actions for trespass to chattels owned by the decedent. Courts interpreting this statute came to view the executor as the assignee of the decedent's chose in action. See ’WM'J. Allen, Annotation, Assignability of Claim in Tort for Damage to Personal Property, 57 A.L.R.2d 603, 619 (1958).

. Allowing a client to assign his chose in action against his attorney would weaken the attorney's duty of loyalty and confidentiality. In addition, this could become a dangerous "bargaining chip in the negotiation of settlements — particularly for clients without a deep pocket. An adversary might well make a favorable settlement offer to a judgment-proof or financially strapped client in exchange for the assignment of that client's right to bring a malpractice claim against his attorney." Pi-cadilly, 582 N.E.2d at 342-43.

. The direct action rule is "well-settled” in Indiana, subject to a limited exception "[w]here the plaintiff is not suing the insurance company to establish that its insured committed a tort against the plaintiff, but rather is suing to establish whether the insurer can deny coverage or whether the insurance policy remained in effect, such suit is not a direct action against an insurer.” City of South Bend, 821 N.E.2d at 10 (quotation omitted).

. See, e.g., Economy Fire & Casualty Co. v. Collins, 643 N.E.2d 382, 384 (Ind.Ct.App. 1994) (insured's estate' voluntarily entered into assignment agreement with plaintiff, assigning estate's cause of action against insurer, but releasing estate from any future obligation).