In the

# United States Court of Appeals

## For the Seventh Circuit

No. 21-3025

DURO, INC., *et al.*,

*Plaintiffs-Appellants*,

*v.*

E. SPENCER WALTON, JR., *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:13-cv-00103-JD — **Jon E. DeGuilio**, *Chief Judge*.

SUBMITTED MARCH 31, 2022[*] — DECIDED AUGUST 3, 2022

Before MANION, HAMILTON, and BRENNAN, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Indiana law holds that legal malpractice claims are not assignable. See *Picadilly, Inc. v. Raikos*, 582 N.E.2d 338 (Ind. 1991), abrogated on other grounds by *Liggett v. Young*, 877 N.E.2d 178 (Ind. 2007). The rule is based largely on a concern that if legal malpractice claims could be

---

[*] We granted the appellants' motion to waive oral argument, which the appellees did not contest.

assigned, parties would use those claims as bargaining chips in settlement negotiations, as occurred in this case, and that prospect would undermine attorney-client relationships and confidences. As explained below, in this case there was no nominal assignment—the corporation that held the theoretical claim in this case still holds it—but litigation over control of that corporation was settled in part by transferring full control to a new owner, Amit Shah. Part of the settlement tried to enable Shah and the corporation to pursue the lawyers who had formerly opposed him in the litigation over control of the corporation. In a careful and detailed opinion, the district court held that the terms of the settlement resulted in a de facto assignment of the corporation's theoretical legal malpractice claim to Shah by using the corporation as his alter ego, so that the bar on assignment should apply. *Duro, Inc. v. Walton*, No. 3:13-cv-00103-JD, 2021 WL 4453741 (N.D. Ind. Sept. 29, 2021). We agree with the district court and affirm summary judgment for the defendants.

I.   *Factual and Procedural Background*

Duro, Inc. and related entities were in the business of selling pallets, which are used for storing and transporting goods. Before 2017, Duro had three shareholders. The majority shareholder, Terry Rodino, also served as president of Duro. Amit Shah and the other minority shareholder often did not agree with Rodino's management decisions. Those disagreements resulted in numerous lawsuits in state and federal courts spanning over a decade. Most of that history is not relevant here, and we will focus on the facts necessary to resolve this appeal.

In February 2013, Shah and the other minority shareholder filed this suit against Rodino and Duro. The complaint

included allegations of money laundering and racketeering in violation of federal and state statutes. After motions practice aimed at the pleadings, plaintiffs added in June 2015 a shareholder derivative claim of legal malpractice, nominally on behalf of Duro, against the May Oberfell Lorber law firm and attorneys E. Spencer Walton, Jr., and Georgianne M. Walker (together, "May Oberfell").

May Oberfell had represented both Rodino and Duro in the case. Shah and the other minority shareholder moved twice to disqualify May Oberfell as counsel. A magistrate judge denied both motions. Eventually, however, May Oberfell withdrew from representing Rodino and Duro.

In September 2017, Shah and the other minority shareholder settled their claims against Rodino and Duro. As part of the settlement, Duro redeemed both Rodino's and the other minority shareholder's shares, making Shah the sole owner of Duro. Critical to this appeal, the settlement also preserved any claims Duro might have against May Oberfell. In addition, as part of the settlement, Rodino signed a document waiving the attorney-client and work-product privileges regarding all communications, disclosures, advice, and documents between him and May Oberfell.

Shortly after the settlement agreement was signed, Shah took over effective control of Duro and transferred nearly all of Duro's assets, which were worth millions, to his own pallet company. As a result, Duro no longer has any hard assets, income, employees, revenue, or customers. Shah left one asset, however, in the corporate shell of Duro—the legal malpractice claim against May Oberfell.

After these actions, Shah—now acting through Duro—filed a third amended complaint in the district court in June 2018. Duro and Shah asserted individual claims against May Oberfell for (1) legal malpractice and (2) what they called "conflict of interest." In particular, the plaintiffs alleged that, with May Oberfell's consent and assistance, Rodino had breached his fiduciary duties as the sole director and officer of Duro. They also alleged that May Oberfell failed to take adequate steps to protect Duro and to prevent Rodino from engaging in unlawful conduct. The district court dismissed Shah's individual claim for legal malpractice and dismissed the "conflict of interest" claim.[1]

After discovery, May Oberfell moved for summary judgment on Duro's legal malpractice claim. The district court granted the motion. See *Duro, Inc. v. Walton*, 2021 WL 4453741, at *20. The court reasoned that the legal malpractice claim had undergone a "de facto" assignment and was therefore barred as a matter of Indiana law. The district court then entered final judgment in favor of the defendants. Duro has appealed.[2]

---

[1] As part of the amended complaint, the other minority shareholder also brought individual claims against May Oberfell, which the district court dismissed. In addition, Duro, Shah, and the other minority shareholder asserted claims against Rodino and Duro's successor counsel in this case. The district court later granted a stipulation to dismiss those claims. Finally, the third amended complaint alleged that May Oberfell conspired to violate the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. The district court granted summary judgment to May Oberfell on this claim, and Duro has not appealed that decision.

[2] The district court also concluded that no reasonable jury could find for Duro on the merits of its legal malpractice claim. Since we agree that Duro cannot bring this legal malpractice claim at all, we need not address the claim's merits.

II. *Analysis*

We review de novo the district court's grant of summary judgment and "draw all [reasonable] inferences from conflicting evidence in the light reasonably most favorable to [Duro] as the non-moving party." *Knopick v. Jayco, Inc.*, 895 F.3d 525, 527–28 (7th Cir. 2018). Summary judgment is appropriate when "there are no genuine disputes of material fact between the parties and no reasonable factfinder could find for the non-movant on an essential element on which it bears the burden of proof at trial." *Ostrowski v. Lake County*, 33 F.4th 960, 964 (7th Cir. 2022); see also Fed. R. Civ. P. 56(a).

The decisive question is whether Duro can bring this legal malpractice claim at all. All parties agree that some legal malpractice claims are unassignable under Indiana law. The parties disagree over whether Duro's legal malpractice claim depends on such an invalid assignment. The district court had federal-question jurisdiction over the case based on the claim under the Computer Fraud and Abuse Act. The malpractice claim falls within the federal courts' supplemental jurisdiction under 28 U.S.C. § 1367(a). The claim is governed by Indiana law. Our task under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), is to decide the issue as we believe the Indiana Supreme Court would. E.g., *Reid Hospital & Health Care Services, Inc. v. Conifer Revenue Cycle Solutions, LLC*, 8 F.4th 642, 650 (7th Cir. 2021); *Rodas v. Seidlin*, 656 F.3d 610, 626 (7th Cir. 2011).

A. *The Picadilly Case*

It is well established under Indiana law that most assignments of legal malpractice claims are prohibited. That rule dates back to *Picadilly, Inc. v. Raikos*, 582 N.E.2d 338 (Ind. 1991), abrogated on other grounds by *Liggett v. Young*, 877

N.E.2d 178 (Ind. 2007). Picadilly had operated a bar, and it lost a trial in a case brought by a person injured by a drunken patron. That plaintiff won both compensatory and punitive damages. Picadilly then sued its lawyers and later filed for bankruptcy. The bankruptcy court discharged the punitive damages award by assigning Picadilly's legal malpractice claim to the injured person who had won the award. As a result, the winning party of the jury verdict, Picadilly's adversary, had a legal malpractice claim against Picadilly's lawyers (and was represented by the same lawyers who had prevailed against Picadilly at trial).

The Indiana Supreme Court held that the assignment was barred under Indiana law. The court started with the general position that public policy concerns dictate whether assigning claims is permissible in a given context. 582 N.E.2d at 341 ("Assignment should be permitted or prohibited based on the effect it will likely have on modern society, and the legal system in particular."). The court identified two public policy concerns animating its decision on the assignment of legal malpractice claims: "the need to preserve the sanctity of the client-lawyer relationship, and the disreputable public role reversal that would result during the trial of assigned malpractice claims." *Id.* at 342.

Regarding the client-lawyer relationship, the court focused on two duties owed by lawyers to clients that would be undermined by the assignment of legal malpractice claims. It began with the duty to act loyally. If a party could readily assign its legal malpractice claims, the court said, a lawyer might be less motivated to engage in zealous advocacy if she knew the client's adversary could retaliate by buying up the client's malpractice claim. The court also expressed concern

that such assignments could become bargaining chips in settlement negotiations. Adversaries, for instance, could offer financially strapped parties settlements in exchange for their legal malpractice claims. "Lawyers involved in such negotiations would quickly realize that the interests of their clients were incompatible with their own self-interest." 582 N.E.2d at 343. Permitting assignments, the court predicted, would result in "the merchandizing [of] such causes of action," weakening the duty of loyalty in the process. *Id.* at 342 (citation omitted).

Assignment of legal malpractice claims could also threaten a lawyer's duty to maintain client confidentiality. When a client sues an attorney for malpractice, the attorney may reveal confidential client information if necessary to establish a defense. Ind. Professional Conduct Rule 1.6(b)(5). That rule also applies if a client tries to assign her claim. *Picadilly*, 582 N.E.2d at 343. So long as the client is the one initiating that suit, "the scope of the disclosure can be limited by the client's power to drop the claim." See *id.* But if the client is "relegated to observing from the sidelines as the assignee pursues the attorney," the attorney may reveal confidential information that the client might have preferred to keep confidential. *Id.* As a result, "[f]ar-sighted clients would be encouraged to withhold damaging information from their attorney in order to preserve their ability to sell off a malpractice claim without the fear of losing control over that information." *Id.* Such a result would erode the duty of confidentiality.

Then, to illustrate the court's concern about public "role reversals" if legal malpractice claims could be assigned, the court considered the Picadilly claim itself. 582 N.E.2d at 344. The assignee of Picadilly's legal malpractice claim had won

$225,000 in compensatory and punitive damages at the first trial. In a later trial for the malpractice claim against Picadilly's lawyers, that same assignee would have to argue positions directly contrary to the positions he took in winning the first trial. He would need to prove *that he should not have won* in the first trial, and that he won as a proximate result of the opposing lawyers' malpractice. Such a change in position, the court said, would be evident to the jury members in the second case, leaving them all "with less regard for the law and the legal profession than they had when they entered" the courtroom. *Id.*[3]

For the Indiana Supreme Court, these public policy concerns outweighed any benefits in permitting assignment of legal malpractice claims. The court thus held that "clients [cannot] sell off their [legal malpractice] claims for pursuit by others." 582 N.E.2d at 345. Picadilly's assignment was therefore invalid as against public policy. This bar on assigning legal malpractice claims remains the law of Indiana. E.g., *State Farm Mutual Automobile Insurance Co. v. Estep*, 873 N.E.2d 1021, 1025–26 (Ind. 2007) (applying *Picadilly*'s holding that "legal malpractice claims are not assignable"); *Smith v. Progressive Southeastern Insurance Co.*, 150 N.E.3d 192, 202 (Ind. App. 2020) (same).

---

[3] A later case has indicated that such a role reversal is not essential for the rule against assignment to apply. See *Rosby Corp. v. Townsend, Yosha, Cline & Price*, 800 N.E.2d 661, 666 (Ind. App. 2003) (explaining that "the [*Picadilly*] court made no indication that its holding was limited" to instances where the assignee would make use of a role reversal).

B. *The De Facto Assignment Here*

We agree with the district court that the legal malpractice claim in this case was the subject of a de facto assignment that is invalid under *Picadilly*. Duro is correct that there was no formal assignment in this case in the traditional sense. The same corporate entity still holds it. But we believe the Indiana Supreme Court would hold that *Picadilly* forecloses Duro's legal malpractice claim nonetheless.

We begin with the mechanics of this de facto assignment. Recall that this lawsuit began when Shah and Duro's other minority shareholder sued Duro and Rodino, the majority shareholder. This was not the first time the minority shareholders sued Duro and Rodino, nor was this the first case in which May Oberfell represented Duro and Rodino. And in those suits, Shah sought damages from Duro and even dissolution of the corporation. After Shah settled the claims with Duro and Rodino in 2017 and became the sole owner of Duro, he transferred nearly all of Duro's assets to his own pallet company. Duro's one asset that remains is this legal malpractice claim against May Oberfell.

A traditional assignment on these facts would have occurred if Duro and Rodino had agreed to assign Duro's legal malpractice claim to Shah personally as part of the 2017 settlement. Shah could not have sued May Oberfell for legal malpractice without such an assignment since he never had an attorney-client relationship with May Oberfell. Such an assignment would have been invalid, however, falling squarely within the rule of *Picadilly*.

The parties tried to take a different route to that same destination. They agreed to give Shah complete ownership and

control of Duro by redeeming the other shareholders' shares. As additional bargaining chips, the parties agreed to reserve Duro's ability to bring a legal malpractice suit against May Oberfell, and Rodino waived all applicable privileges from May Oberfell's representation of him and Duro. Shah then used his control of Duro to pursue this malpractice claim against May Oberfell. With Duro as his alter ego, Shah is trying to achieve what he could not do on his own.

We agree with the district court that permitting the de facto assignment to Shah here would run contrary to *Picadilly*'s aims and the public policies that are the foundation for the rule. The legal malpractice claim was a bargaining chip in the settlement negotiations between Shah and Rodino. And as part of the bargain, Rodino had to waive all attorney-client and work-product privileges between Duro, himself, and May Oberfell. Duro also had to expressly preserve its legal malpractice claims. These actions effectively pitted Duro and Rodino against the lawyers who had represented them, but for the benefit of Shah. As *Picadilly* predicted, the parties to this suit were readily willing to "merchandize" the legal malpractice claim and privileges when it was convenient for them to help secure a settlement, thereby weakening the lawyers' duty of loyalty in the process. 582 N.E.2d at 342.

Next, while the express waiver might seem to minimize the concerns about disclosure of a client's confidential information, it cannot be the case that, as a matter of law, once a party secures a privilege waiver from the client, that client's legal malpractice claim can be assigned. If so, privilege waivers would certainly take on an oversized role in settlement negotiations, something that again *Picadilly* sought to prevent. The privilege waiver would simply be one more chip in the

bargaining for the settlement, and the *Picadilly* rule would be easy to avoid.

Duro argues in response that a reasonable jury could find that Shah was never adverse to Duro itself. It contends that every lawsuit Shah filed was in Duro's interests, brought to enforce Duro's rights, and that Duro was named as a defendant at times only "for jurisdictional purposes," though what that really means is that Shah was bringing this case as a shareholder derivative action. If Shah was never an adversary, says Duro, then *Picadilly*'s bar on assignments should not apply. That argument takes the legal fictions of the shareholder derivative action to unrealistic lengths that would broadly undermine the *Picadilly* rule against assignments. We do not believe the Indiana Supreme Court would allow such undermining of *Picadilly* and the policies furthered by its rule against assignment.

In addition, we doubt that the *Picadilly* rule is actually limited to assignments to former adversaries. In *Rosby Corp. v. Townsend, Yosha, Cline & Price*, 800 N.E.2d 661, 666 (Ind. App. 2003), the assignee argued—as Duro does here—that the *Picadilly* rule against assignment should be confined to assignments to former litigation adversaries. The *Rosby* court rejected that position: "*Picadilly* represents a bright-line rule drawn by the supreme court holding that no legal malpractice claims may be assigned, regardless whether they are assigned to an adversary." *Id.* at 665. Permitting assignments to nonadversaries, the court said, would lead to many of the same concerns that drove the decision in *Picadilly*. For example, people would treat the claims as commodities and a market would emerge, "denigrat[ing] the unique fiduciary relationship that exists between a client and an attorney." *Id.* at 666;

accord, *Smith*, 150 N.E.3d at 202 ("The [*Picadilly*] court was mainly concerned with the impact of assigning *any* legal malpractice claims … not *how* legal malpractice claims were assigned or *who* would be subject to litigation from the assignment.").

The one recognized exception to *Picadilly* comes from *Summit Account & Computer Service, Inc. v. RJH of Florida, Inc.*, 690 N.E.2d 723 (Ind. App. 1998). In that case, the Indiana Court of Appeals held that *Picadilly* does not bar assignments to a corporation's successor in interest. But *Summit Account* supports May Oberfell in this case, not Shah and Duro. The court relied on several factors to conclude that the assignee was the first corporation's successor in interest. None of those factors are present here.

First, the *Summit Account* court asked whether the corporation's ownership was the same before and after the sale. In that case, one person was the sole shareholder, director, and officer of both the first corporation and the successor in interest. The same is not true in this case. Before the settlement, Duro had three shareholders and Shah had been a minority shareholder. Now, Shah is Duro's sole owner. The other factors in *Summit Account* related to whether the successor engaged in the same business as its predecessor. In *Summit Account*, for instance, the predecessor engaged in the same business in the same place and continued to conduct that business after the sale. 690 N.E.2d at 728. Duro today, by contrast, does not engage in any business at all. After the 2017 settlement gave him sole control, Shah transferred all of Duro's hard assets to his own pallet company and suspended Duro's operations. Since 2017, Shah's Duro has been only an empty shell. It and the pre-settlement Duro share only a name. That is not

enough to treat today's Duro as a direct continuation of the pre-settlement Duro.

In addition, Shah gained the legal malpractice claim as a bargaining chip in the 2017 settlement. He did not purchase Duro to continue its business, as occurred with the successor corporation in *Summit Account*. *Picadilly*'s public policy concerns are not as salient when a corporation purchases another corporation. Merger and acquisition practices rely on corporations' ability to assign their assets (and liabilities). *Summit Account*, 690 N.E.2d at 728 (explaining that when a corporation is "a direct continuation of its predecessors," it "should have the same rights and liabilities" (internal quotation marks omitted)), citing *Mishawaka Brass Manufacturing v. Milwaukee Valve Co.*, 444 N.E.2d 855 (Ind. App. 1983). But *Picadilly*'s public policy concerns are present, as discussed above, when a party seeks through a settlement the right to pursue a legal malpractice claim. Indiana courts have consistently emphasized that whether a legal malpractice claim is assignable ultimately comes down to policy considerations. E.g., *State Farm*, 873 N.E.2d at 1025. The public policy calculus is simply different in these two different contexts. In that sense, *Summit Account* is distinguishable on factual and public policy grounds. The *Summit Account* limitation on the *Picadilly* rule does not apply here. In fact, the differences between this case and *Summit Account* emphasize why the *Picadilly* rule should apply here.[4]

---

[4] We do not mean to imply that if Shah had simply purchased Duro and continued to operate it, today's outcome may have been different. A court would still have to consider *Picadilly* and the *Summit Account* factors to determine if the company asserting the legal malpractice claim were truly a direct continuation of its predecessor. Duro cannot satisfy those factors.

Duro also argues that there was no assignment of any kind here because Shah himself asserted the legal malpractice claim in his shareholder derivative complaint back in 2015. This was before the 2017 settlement that made Shah the sole owner of Duro. Duro, however, does not cite any support for the argument that, in Indiana, minority shareholders can bring derivative legal malpractice claims on behalf of a corporation against its outside legal counsel. The district court found no support for this argument, and neither have we. At least one state has expressly rejected it. In *McDermott, Will & Emery v. Superior Court*, 99 Cal. Rptr. 2d 622 (Cal. App. 2000), the appellate court went so far as to grant a writ of mandamus to direct dismissal of such a claim. Most telling for our purposes, the California court relied on public policy grounds—particularly the need to protect attorney-client privilege and the attorney-client relationship—that echo the grounds for the *Picadilly* rule in Indiana and that are at stake in this case. Moreover, even if Indiana would allow such a derivative claim, we agree with the district court that the interest Shah gained through Duro after the settlement did not match the interest he tried to assert in 2015.

At bottom, Duro's assertion of its legal malpractice claim depends on a de facto assignment that is barred as a matter of Indiana law. May Oberfell was therefore entitled to summary judgment. The judgment of the district court is

AFFIRMED.