EASTON BUSINESS OPPORTUNITIES, INC.; AND KEITH EASTON, APPELLANTS, v. TOWN EXECUTIVE SUITES-EASTERN MARKETPLACE, LLC; MICHAEL A. VESPI; AND TOWN CONSULTING LLC, RESPONDENTS.

No. 50060

EASTON BUSINESS OPPORTUNITIES, INC.; AND KEITH EASTON, APPELLANTS, v. TOWN EXECUTIVE SUITES-EASTERN MARKETPLACE, LLC; MICHAEL A. VESPI; AND TOWN CONSULTING LLC, RESPONDENTS.

No. 50751

May 6, 2010                                                     230 P.3d 827

*David J. Winterton & Associates Ltd.* and *David J. Winterton*, Las Vegas, for Appellants.

*Prince & Keating* and *Dennis M. Prince* and *Douglas J. Duesman*, Las Vegas, for Respondents.

Before PARRAGUIRRE, C.J., DOUGLAS and PICKERING, JJ.

## OPINION

By the Court, PICKERING, J.:

This dispute involves a commission claimed under an exclusive right-to-sell brokerage agreement for the sale of a business. After a bench trial, the district court ruled in favor of the seller and against the broker's assignee. It found the assignment ineffective and the commission unrecoverable, based on the broker's breach of an implied duty to have given the seller a list of the people to whom the broker had shown the business, to whom the seller could not sell during the extension period without incurring liability for a commission. The agreement, as written, supports the opposite result and should have been upheld. Upholding the commission claim makes it necessary to reach the assignee's fraudulent conveyance claims, as to which unresolved issues of fact remain. Accordingly, we reverse and remand.

### I.

The brokerage agreement was between Town Executive Suites–Eastern Marketplace, LLC (TES), as seller, and Century 21-Advantage Gold and Michael Brelsford, as broker (collectively, Century 21). The agreement gave Century 21 the "exclusive and irrevocable" right to sell TES's office suite business for a six-month period, from May 19, 2003, to November 18, 2003.[1] If the business sold on terms acceptable to TES during this exclusive list-

---

[1]TES held a master lease on the office suite business. Although the district court's findings refer to TES being sold, it appears from the record that this was an asset sale of TES's rights in the master lease, personal property, and goodwill, not a sale of ownership rights in TES.

ing period, TES owed Century 21 a 10-percent commission, regardless of who originated the sale.

Included in the agreement was an "extender" clause. The extender clause provided that the same 10-percent commission "shall be due . . . (c) if within 180 calendar days of the final termination . . . of this Agreement, the Property is sold, conveyed, or otherwise transferred to anyone with whom the Broker has had negotiations or to whom the Property was shown prior to the final termination," with one exception: "This section (c) shall not apply if Seller enters into a valid Brokerage Listing Agreement with another licensed real estate Broker after the final termination of this Exclusive Brokerage Listing Agreement."

In late January 2004, after the exclusive listing expired but still within the 180-day extender-clause period, TES sold its business to a buyer to whom Century 21 had shown it during the exclusive listing period, Chip Lightman. Although not a licensed broker, TES's principal, Michael Vespi, had once owned a real estate agency, and he decided to handle the sale of TES's business on his own, without hiring another broker. Vespi asked Lightman if he had an agent or broker, and Lightman said he did not. However, TES didn't check with Century 21 to see if Lightman was someone to whom Century 21 had shown the property during the exclusive listing period, thus triggering a commission under the extender clause. Mistakenly assuming the sale would be commission-free, TES sold its business to Lightman for a lower price than it would have if it had figured in a commission.

The following facts were found by the district court to be undisputed: (1) Century 21 showed the TES business to Lightman during the exclusive listing period; and (2) TES sold its business to Lightman in January 2004, during the extender-clause period. The brokerage agreement as written seems to require payment of a commission in these circumstances. However, the district judge held the opposite based on its additional finding that TES "did not knowingly 'breach' the Brokerage Listing Agreement by selling the property to [Lightman] at the end of January 2004 when [TES] did not know Mr. Lightman was previously shown the property by [Century 21] during the exclusive listing period."

The agent at Century 21 who handled the TES listing was appellant Keith Easton. In December 2003, after the listing expired but still during the extender-clause period, Easton obtained his own broker's license and left Century 21 to open Easton Business Opportunities, Inc. Easton testified he bought out his listings and expirations from Century 21 when he left. No formal written assignment was produced, but in a May 2006 affidavit, Century 21 broker Michael Brelsford, on behalf of himself and Century 21, confirmed that Easton "purchased the rights to all his listings in December 2003" and that the TES listing was "[a]mong the list-

ings that [Century 21] transferred'' to Easton. TES knew Easton had left Century 21 and how to contact him: TES's principal, Vespi, leased Easton the office space he moved into when he left Century 21, and Vespi hired Easton as broker on another property of his.

Some time later, Lightman decided to resell the TES office suite business and asked Easton to act as listing agent and broker on the resale. Thus having learned about TES's business being sold to a buyer he'd developed while with Century 21, Easton asked TES for the commission Easton believed was due. TES refused. By then, TES had allegedly transferred most of its assets, including the office suite sale proceeds, to either Vespi or its affiliate, Town Consulting LLC.

Appellants Keith Easton and Easton Business Opportunities, Inc. (collectively, Easton) sued for the commission, naming respondents TES, Vespi, and Town Consulting (collectively, TES) as defendants on breach of contract, alter ego, unjust enrichment, and fraudulent conveyance claims. After a one-day bench trial, the district court entered judgment against Easton on all claims and, thereafter, awarded respondents their attorney fees and costs. Easton appeals.

The district court denied Easton's claims on three grounds relevant to this appeal.[2] First, it held that Century 21's assignment of its commission rights to Easton was invalid and came too late in any event for Easton to qualify as the real party in interest under NRCP 17(a), as construed in *Thelin v. Intermountain Lumber & Builders Supply, Inc.*, 80 Nev. 285, 392 P.2d 626 (1964). Second, it held that no commission was due, because neither Century 21 nor Easton reminded TES about the extender clause or gave TES a list of prospective buyers who were off-limits during the extender-clause period. Third, treating Easton's fraudulent conveyance claims as targeting TES's sale of its business, rather than its transfer of the sale proceeds to its affiliates, it denied Easton's fraudulent conveyance claims as statutorily insufficient. Finding error in each of these determinations, we reverse.

## II.

The first question to be addressed is assignability. Based on the agreement as written and the facts the district court found to be undisputed, we conclude that the commission was assignable and that Century 21 validly assigned it to Easton. From this it follows that, as Century 21's assignee, Easton has real party in interest status under NRCP 17(a).

---

[2]Easton does not challenge the district court's rejection of alter ego liability or the partial summary judgment order declaring that Vespi signed the agreement as manager for TES, not individually.

## A.

Under ordinary rules of contract law, a contractual right is assignable unless assignment materially changes the terms of the contract or the contract expressly precludes assignment. Restatement (Second) of Contracts § 317(2)(a)-(c) (1981). Because the law looks with "favor on the free assignability of rights and frowns on restrictions that would limit or preclude assignability, . . . [a]nti-assignment clauses [are] narrowly construed." 9 John E. Murray, Jr., *Corbin on Contracts* § 49.9, at 214 (rev. ed. 2007). "To be effective, [an] antiassignment clause should contain a specific prohibition on the power to make an assignment and specifically state that any attempted assignments will be void or invalid." 29 Richard A. Lord, *Williston on Contracts* § 74:22 (4th ed. 2003); *see* Restatement (Second) of Contracts § 322 (1981).

Century 21's assignment of commission rights to Easton did not materially change the terms of the brokerage agreement as to TES. The assignment occurred, at the earliest, when Easton left Century 21 in December 2003, after the exclusive listing terminated. By then, Century 21 had provided the exclusive listing services for which TES owed its return performance—payment of a commission should the business be sold during the extender-clause period to a buyer Century 21 had shown the property to while listing it. "When the obligor's duty is to pay money, a change in the person to whom the payment is to be made is not ordinarily material," Restatement (Second) of Contracts § 317 cmt. d (1981), and there is nothing extraordinary about the assignment of commission rights here.[3]

Neither does the brokerage agreement contain a valid anti-assignment clause. The district court held otherwise, calling on the clause in the agreement prohibiting oral modifications to do double duty as an anti-assignment clause. But the clause on which the district court relied says only that "[t]he terms of this Agreement may not be amended, modified or altered except through a writ-

---

[3]Since Century 21 had already performed its listing services, no question arises as to it having remaining obligations to TES "so 'personal' or involv[ing] such unique skills that [they] may not be delegated." 9 *Corbin on Contracts, supra*, § 49.4, at 199. Assigning its commission rights wouldn't have discharged any remaining duties of Century 21's in any event, absent a novation, which isn't asserted. *See* Restatement (Second) of Contracts § 318 cmt. d (1981) ("An obligor is discharged by the substitution of a new obligor only if the contract so provides or if the obligee makes a binding manifestation of assent, forming a novation. Otherwise, the obligee retains his original right against the obligor." (citations omitted)).

ten agreement signed by all of the parties." This standard no-oral-modification clause does not mention assignment, much less specifically prohibit it. It lacks the specific language prohibiting assignment that the law requires of a valid anti-assignment clause.

Forbidding oral modification and prohibiting assignment are two different things. As *Citibank, N.A. v. Tele/Resources, Inc.*, 724 F.2d 266 (2d Cir. 1983), holds, a standard no-oral-modification clause cannot be pressed into service as an anti-assignment clause because, without more, "[a]n assignment does not modify the terms of the underlying contract. It is a separate agreement between the assignor and assignee which merely transfers the assignor's contract rights, leaving them in full force and effect as to the party charged." *Id.* at 269.

For these reasons we disagree with the district court's reading of the brokerage agreement as a matter of law and conclude that, as written, the brokerage agreement permitted Century 21 to assign its commission rights to Easton.

### B.

The district court alternatively held that, even if the agreement permitted assignment, Easton still could not prevail because the assignment didn't occur until May 2006, when Brelsford's affidavit confirming Century 21's transfer of commission rights to Easton was filed. Citing *Thelin v. Intermountain Lumber & Builders Supply, Inc.*, 80 Nev. 285, 392 P.2d 626 (1964), the district court concluded that post-suit "[a]ssignments do not 'relate back' to the date [a] Complaint was filed," requiring dismissal under NRCP 17(a). This was error, for two reasons.

First, *Thelin* was decided in 1964, before the 1971 amendments to the real party in interest provisions in NRCP 17(a). The 1971 amendments conformed NRCP 17(a) to Fed. R. Civ. P. 17(a), as the latter had been amended in 1966, adding the following final sentence to Rule 17(a):

> No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

The purpose of these amendments was to make unmistakably clear that "the modern function of the [real party in interest] rule in its negative aspect is simply to protect the defendant against a subse-

quent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata.'' Fed. R. Civ. P. 17(a) advisory committee's note (1966).

Even before these amendments, *Thelin*'s rigid holding—that a post-suit assignment cannot cure an initial real party in interest deficiency—was questionable. *See Kilbourn v. Western Surety Co.*, 187 F.2d 567, 571-72 (10th Cir. 1951) (deeming a post-suit assignment sufficient to establish the assignee-plaintiff as the real party in interest under Fed. R. Civ. P. 17(a), given the overriding purpose of the modern Rules of Civil Procedure ''to unshackle the practice of law in the courts from the straight jacket of technical rules of pleading and procedure''), *noted in* 6A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 2d* § 1545, at 351 n.11 (1990). After Rule 17(a)'s amendment, it is today taken as settled law that ''[t]here is no general requirement as to when an assignment must be made and . . . even when the claim is not assigned until after the action has been instituted, the assignee is the real party in interest and can maintain the action.'' 6A Wright & Miller, *supra*, at 350-51. *See Federal Deposit Ins. Corp. v. Hurdman*, 655 F. Supp. 259, 267 (E.D. Cal. 1987) (noting that if the assignor provides post-suit confirmation of the assignment, the objecting defendant is protected from inconsistent claims; whether treated as an assignment or a ratification, this is enough to establish a plaintiff's real party in interest status under Rule 17(a) (quoting Fed. R. Civ. P. 17(a) advisory committee's note (1966); 6C Wright & Miller, *supra*, § 1545, at 654 (1971))).

The affidavit that Century 21/Brelsford filed in this case confirmed that Easton had the sole right to sue for the commission, and it evidenced both Century 21's assignment of rights to Easton and its ratification of Easton's right to sue. This amply protected TES from inconsistent claims or judgments; Rule 17(a) didn't require more. To the extent *Thelin* suggests that a plaintiff cannot establish real party in interest status and avoid dismissal by post-suit ratification or assignment of rights, it conflicts with the prevailing interpretation of the post-amendment version of NRCP 17(a) and no longer represents good law.

There is a second, equally basic reason to reject *Thelin*'s application to this case: The finding that the assignment didn't occur until May 2006, the date of the Century 21/Brelsford affidavit, is in error. The error is either one of law, in presupposing, as TES contends, that a valid assignment requires a signed writing or notice to the obligor; or an error of fact, in transposing the date of the Century 21/Brelsford affidavit (May 2006) with the date of the assignment itself (December 2003, per both Brelsford's affidavit and Easton's testimony). Either way the result is the same: The district court's alternative finding that there was a valid assignment

is correct, but the assignment occurred in December 2003 and not May 2006.

"[I]n the absence of statute or a contract provision to the contrary, there are no prescribed formalities that must be observed to make an effective assignment." 9 *Corbin on Contracts*, *supra*, § 47.7, at 147. The assignor must manifest a present intention to transfer its contract right to the assignee. *Stuhmer v. Centaur Sculpture Galleries*, 110 Nev. 270, 275, 871 P.2d 327, 331 (1994). Absent some additional contract- or statute-based requirement, no particular formality in expressing that intention needs to be followed:

> It is essential to an assignment of a right that the obligee manifest an intention to transfer the right to another person without further action or manifestation of intention by the obligee. The manifestation may be made to the other or to a third person on his behalf and, except as provided by statute or by contract, may be made either orally or by a writing.

Restatement (Second) of Contracts § 324 (1981); *see id.* cmt. a. Applying section 324 here, the manifestation of intent to transfer a contract right was by Century 21, as "obligee," to Easton, as "the other." The assignment was complete as of December 8, 2003, the date both Brelsford and Easton say Century 21 accepted payment from Easton in exchange for certain listings and expiration rights, including TES's.

Century 21 did not confirm the transfer of rights in writing until it supplied the Brelsford affidavit in May 2006. However, nothing required a signed writing for the assignment of commission rights to be effective. As discussed above, the brokerage agreement is silent on assignment; it neither precludes nor specifies a particular form for a valid assignment. Nor have the parties identified any statute that prescribes special formalities for assignment of commission rights.[4]

---

[4]The parties make no argument that NRS 645.320(1), as a type of statute of frauds, required Century 21's assignment of commission rights to Easton to be in writing. Given the general law that, while statute of frauds provisions may "prevent enforcement against an assignor unless there is a memorandum in writing or some substitute formality, . . . they cannot ordinarily be asserted by third persons, including the obligor of an assigned right," Restatement (Second) of Contracts § 324 cmt. b (1981), we decline to find a writing requirement based on NRS 645.320(1) sua sponte. *See also In re Circle K Corp.*, 127 F.3d 904, 908 (9th Cir. 1997) (rejecting the argument that the obligor could assert a valid statute of frauds objection to his obligee's undocumented transfer of its interest to its assignee; "[t]he parties to the assignments do not challenge their validity; it would be for them, not [the obligor], to raise the statute of frauds as a defense to enforcement of the assignments if they so chose" (citing Restatement (Second) of Contracts § 144 (1982))).

TES finally complains that neither Century 21 nor Easton gave notice of the assignment until Easton demanded the commission but this argument is a nonstarter. While failure to give notice of an assignment may affect the rights of the assignee in the event the obligor delivers performance to the obligee/assignor before being notified of the assignment, *see* 29 *Williston on Contracts, supra,* § 74:15, it normally does not invalidate an otherwise valid assignment. 6A C.J.S. *Assignments* § 10 (2004). *See also Wood v. Chicago Title Agency,* 109 Nev. 70, 847 P.2d 738 (1993); *Washoe Co. Bank v. Campbell,* 41 Nev. 153, 167 P. 643 (1917).

For these reasons, we affirm the district court's alternative finding that Century 21 validly assigned its commission rights to Easton but reject as clearly erroneous and contrary to law the finding that the assignment occurred in May 2006 as opposed to December 2003.

### III.

The second question to be addressed is the proper construction of the exclusive right-to-sell brokerage agreement. The district court imposed a duty on the broker to notify its seller of potential buyers whose history with the broker carries commission exposure on a sale during the extender-clause period. Since notice wasn't given and the seller didn't know its buyer would trigger liability for a commission, the district court denied recovery. This was error, as it reallocated the responsibility and risk laid out in the brokerage agreement without adequate legal or contractual basis for doing so.

### A.

Easton's commission claim is based on the exclusive right-to-sell brokerage agreement. "[W]here the action is based on a listing agreement[, t]he right of the [broker] to compensation must be governed by that agreement." *Nollner v. Thomas,* 91 Nev. 203, 207, 533 P.2d 478, 480-81 (1975) (footnote omitted); *accord Caldwell v. Consolidated Realty,* 99 Nev. 635, 638, 668 P.2d 284, 286 (1983) ("Where a broker's action to recover a commission . . . is based on a listing agreement, the terms of the agreement govern the broker's right to compensation.").

The brokerage agreement gave Century 21 the exclusive right to sell the business for a 6-month period and added to that a 180-day extension period. If TES sold during the extension period to a buyer with whom Century 21 had negotiations or to whom it showed the property during the exclusive listing period, TES owed Century 21 a commission (with one exception that does not apply

here). The brokerage agreement did not condition the seller's liability for the commission on the seller being notified of potential buyers who carried commission risk or knowingly selling out from under the broker. It placed liability on the seller for the commission if the seller sold during the extension period to a buyer to whom the broker had shown the property or negotiated with—in other words, it allocated the risk of being wrong about the buyer being commission-free to the seller. The district court found that, without checking with the broker, TES sold to a buyer Century 21 had developed. Absent breach of some other duty by Century 21, a commission was owed under the agreement as written. Indeed, when asked at trial if the agreement didn't support liability for a commission on TES's sale to Lightman, even TES's principal, Vespi, agreed: "That's what the listing agreement says. Yes, sir."

Despite this concession, TES cites *King v. Dean*, 249 N.E.2d 45 (Ohio 1969), and *Mayo v. Century 21 Action Realtors*, 823 S.W.2d 466 (Ky. Ct. App. 1992), and urges that the agency relationship between a broker and its seller requires imposing on the broker the duty to advise the seller of the names of potential buyers who carry commission exposure, even where, as here, the agreement does not state this duty. These cases represent the minority rule on an issue that has divided courts nationally. T.C. Williams, Annotation, *Real-Estate Broker's Right to Commissions as Affected by Owner's Ignorance of Fact That Purchaser Had Been Contacted by Broker*, 142 A.L.R. 275 (1943 & Supp. 2010) (collecting cases).

The majority view holds that, "[h]aving promised the broker a commission, the principal ordinarily should know that the appearance of a customer may have been caused by the broker, and to avoid liability for payment he should make inquiries of the broker." Restatement (Second) of Agency § 448 cmt. f (1958). The Restatement illustrates its comment with the following:

> P promises A a commission if he will secure a purchaser for Blackacre. A advertises, and T, seeing it, goes to A. T feigns indifference but soon afterward applies to P. P asks T if he comes as a result of any action on the part of A. T falsely says that he has not seen A's advertisement. Without speaking to A, and because he believes T's statement, P sells to him at a price lower than the asking price. A is entitled to his commission.

*Id.* illus. 9. These are analogous to the facts presented here, and represent the better-reasoned view. *Monadnock Ins. Agency, Inc. v. Manning*, 374 A.2d 961, 510 (N.H. 1977); *see also Shands v. Wm R. Winton, Ltd.*, 91 P.3d 416, 419 (Colo. Ct. App. 2004).

At least one state, Minnesota, has imposed the duty for which TES contends by statute. Minn. Stat. Ann. § 82.21(1)(b)(5) (West

2009), *discussed in* Barlow Burke, Jr., *Law of Real Estate Brokers* § 4.03, at 4-42 (2009) (noting that the Minnesota statute requires that a broker who uses an extender clause—there called an override clause—"must supply the vendors with a 'protective list' of prospects with whom the broker has dealt during the listing period"). And, of course, parties are free to negotiate and include a clause requiring the broker to give the seller notice of those buyers to whom a sale during the extension period will trigger a commission—such clauses, if included, are upheld. Burke, *supra*, at 4-32; 12 C.J.S. *Brokers* § 253 (2009) (noting that parties can contractually require notice of prospective buyers who carry commission risk and that, absent contractual provision or other special circumstance, the seller's ignorance of the broker's involvement does not normally defeat liability for a commission). But absent contract provision or statutory requirement, we are loath to impose such an obligation as a matter of common law and, in so doing, rewrite the agreement according to our views of public policy pertaining to the best form of contract to govern a broker's relationship with its seller. 5 *Williston on Contracts*, *supra*, § 12:3 ("public policy . . . requires that parties of full age and competent understanding must have the greatest freedom of contracting, and contracts, when entered into freely and voluntarily, must be upheld and enforced by the courts").

### B.

As a fallback, TES argues that the agreement, which was on a form supplied by the broker, should be construed against Easton, as Century 21's assignee. However, TES fails to identify any textual ambiguity in the agreement or other legal basis for importing this policy-based duty into the written agreement both parties signed. The commission could have been avoided or passed on to the buyer if the seller had checked with the broker and either declined the deal or increased its price. This practical consideration didn't introduce an ambiguity into the agreement or confront the district court with conflicting legal duties. It had significance only as a commonsense solution to the problem the seller said required the court to read new terms into the agreement.

When asked for an interpretation of the extender clause that did not require payment of a commission in this case, TES's principal, Vespi, had no answer, except to say that he didn't read the agreement or have it in mind when he sold to Lightman. *But see Holzman v. Blum*, 726 A.2d 818, 831 (Md. Ct. Spec. App. 1999) ("The Agreement clearly addressed the terms and conditions under which [the sellers] would owe the Broker a fee and [the Broker] had no legal duty to remind [sellers] of the terms of the

Agreement that [they] had signed."). To imply a duty into an integrated agreement requiring the broker to notify the seller of the prospects it developed—or to remind the seller of its obligations under an extender clause—would impinge on the parties' freedom of contract with regard to the compensation to be paid the agent, as to which the parties, here both equally sophisticated, dealt with each other at arm's length, and is inappropriate. *Id.* at 831-32.[5]

*Nollner v. Thomas*, 91 Nev. 203, 533 P.2d 478 (1975), is analogous. *Nollner* involved an open listing agreement. "To avoid disputes the parties fixed the conditions upon which a commission would be payable and agreed upon the provision for payment if a sale was made in accordance with the contract terms." *Id.* at 207, 533 P.2d at 481. The sale didn't qualify for a commission under the agreement as written, but the district court implied terms into the agreement to allow recovery by the broker. *Id.* This court reversed, holding that it was error to "read into [the agreement] a clause or condition which does not exist." *Id.* Although the outcomes are opposite in terms of who wins, this case and *Nollner* invoke under the same legal principle: A court has the obligation to enforce an unambiguous agreement as written, absent conflict with statute, offense to public policy, ambiguity, fraud, unconscionability, or other recognized basis for avoidance.

## C.

The parties mention "procuring cause" in their briefs but do not identify any legitimate role for the doctrine in this case. Where, as here, the "parties negotiated specific terms for payment of [a] commission, [the] 'procuring cause' doctrine [is] not a part of [the] listing agreement so as to modify those terms," *Carrigan v. Ryan*, 109 Nev. 797, 799, 858 P.2d 29, 31 (1993) (citing *Nollner*, 91 Nev. at 207, 533 P.2d at 481), especially in the context of a commission claim based exclusively on an exclusive right-to-sell agreement, *see Atwell v. Southwest Securities*, 107 Nev. 820, 825, 820 P.2d 766, 769-70 (1991). In the exclusive right-to-sell context, "[t]he duty to pay the commission is not viewed as a remedial penalty for breach of an executory contract but as a debt owed for a fully performed contract [and] it is unnecessary for the broker to prove that he . . . was the procuring cause of the sale" if any of the eventualities stated in the agreement as giving rise to liability

---

[5]The fact that the agreement was on a standard realtor's Multiple Listing Service form does not defeat its enforcement, as TES suggests. The rule that contracts should be construed against the drafter—*contra proferentem*—applies only "as a rule of last resort when the contract is ambiguous or unconscionable." *Thompson v. Amoco Oil Co.*, 903 F.2d 1118, 1121 n.3 (7th Cir. 1990). Ambiguity is not established and unconscionability is not asserted.

for the commission occur. 10 Patrick Rohan, Bernard Goldstein & Charles Bobis, *Real Estate Brokerage Law and Practice* § 4.06[5][a] (2009). Here, the district court found that Century 21 showed the property to Lightman during the exclusive listing period and that TES sold the property to him during the extender-clause period. Liability for the commission was thus established as a matter of law on these facts under the agreement as written.

## IV.

The final issue concerns Easton's fraudulent conveyance claim. From the record, it appears that Easton asserted this claim under NRS Chapter 112. The fraudulent conveyance claim did not concern TES's sale of its business to Lightman (the buyer of the business) but TES's transfer of the proceeds of that sale and other assets to its affiliates, Vespi and/or Town Consulting. Because the district court did not make the findings required to adjudicate the fraudulent conveyance claim under *Herup v. First Boston Financial*, 123 Nev. 228, 162 P.3d 870 (2007), and *Sportsco Enterprises v. Morris*, 112 Nev. 625, 917 P.2d 934 (1996), we reverse and remand for further proceedings on the fraudulent conveyance claim. This disposition also leads us to vacate the award of attorney fees, which was premised on the judgment against Easton on the commission claim.

REVERSED and REMANDED.

PARRAGUIRRE, C.J., and DOUGLAS, J., concur.