**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| RUSSELL ROAD FOOD AND BEVERAGE, LLC, a Nevada limited liability company, *Plaintiff-Counter-Defendant-Appellee*, | No. 14-16096 D.C. No. 2:12-cv-01514-LRH-GWF |
| v. | OPINION |
| FRANK SPENCER, an individual; CRAZY HORSE CONSULTING, INC., an Ohio corporation, *Defendants-Counter-Claimants-Appellants*. | |

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Submitted May 12, 2016[*]
San Francisco, California

Filed July 22, 2016

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

Before: John T. Noonan, Kim McLane Wardlaw,
and Richard A. Paez, Circuit Judges.

Opinion by Judge Wardlaw

## SUMMARY**

### Trademark

Affirming the district court's summary judgment, the panel held that the plaintiff was the assignee of a valid trademark co-existence agreement entered into with the former owner of the registered mark "Crazy Horse" and therefore had the right to use the mark.

## COUNSEL

Kaleb D. Anderson; Lipson, Neilson, Cole, Seltzer, Garin, P.C., Las Vegas, Nevada; Harold M. Schwarz, III; Stark & Knoll Co., LPA, Akron, Ohio; for Defendants-Appellants.

Bruno Tarabichi, Owens Tarabichi LLP, San Jose, California; for Plaintiff-Appellee.

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**OPINION**

WARDLAW, Circuit Judge:

Once associated with a legendary Native American leader, "Crazy Horse" is now a registered trademark for "entertainment services, namely, exotic dance performances." We must decide whether Russell Road's use of the mark "Crazy Horse III" for its Las Vegas strip club infringes defendants Frank Spencer and Crazy Horse Consulting's rights to the trademark "Crazy Horse." The district court granted summary judgment to Russell Road, holding that it has the right to use the mark because it is the assignee of a valid trademark co-existence agreement entered into with the former owner of the registered Crazy Horse mark. We agree, and therefore affirm the entry of summary judgment in favor of Russell Road.

I.

The mark "Crazy Horse" has been associated with adult entertainment since Alain Bernardin opened the celebrated Crazy Horse Saloon off the Champs-Elysees in 1951. And it has been associated with heated trademark disputes since Bernardin sued a London imitator in 1967. *See Bernardin v. Pavilion Properties*, 19 R.P.C. 581 (1967).[1] In the United States, individuals and corporations have used the "Crazy Horse" brand for motorcycle gear, whiskey, rifles, and, of course, strip and exotic dance clubs. Since at least the 1970s,

---

[1] The historical record does not explain why Bernardin chose the name of the Native American leader for his Saloon. *See Bernardin*, 19 R.P.C. at 852.

Crazy Horse nightclubs have opened everywhere from Anchorage, Alaska to Pompano Beach, Florida.

This case concerns the nature of the right to the trademark, as distinguished from the trademark owners' assignment of the right to peaceably use the mark; here, a "trademark co-existence agreement." Although the parties' interactions and arrangements are byzantine, ultimately the parties' respective rights are clear.

In January 2006, Carl Reid, a longtime owner of strip clubs in the Carolinas, successfully registered the marks "Crazy Horse" and "Pure Gold's Crazy Horse" for "entertainment services, namely, exotic dance performances" with the United States Patent and Trademark Office ("USPTO"). Years later, Russell Road attempted to register the mark "Crazy Horse III Gentlemen's Club at the Playground" for its strip club in Las Vegas, while Frank Spencer attempted to register the "Crazy Horse" mark for his chain of strip clubs in Ohio. The USPTO refused each of these applications under 15 U.S.C. § 1052(d) because it found a likelihood of confusion with Reid's previously registered marks. Each party then pursued alternative means to obtain the rights to use the mark "Crazy Horse."

*A. Russell Road's Claim to the Crazy Horse Name*

Russell Road's claim to rightful use of the Crazy Horse mark derives from the assignment of a trademark co-existence agreement between Reid and Crazy Horse Too A Gentlemen's Club, a Nevada corporation owned by John Salvador. In September 2007, Crazy Horse Too attempted to register that name as a mark for its Las Vegas strip club. Crazy Horse Too's application, like those filed by Russell

Road and Spencer, was refused based on the likelihood of confusion with Reid's previously registered marks. Crazy Horse Too next initiated cancellation proceedings to invalidate Reid's "Crazy Horse" and "Pure Gold's Crazy Horse" marks. In July 2009, the USPTO's Trademark Trial and Appeal Board ("TTAB") notified Reid of the cancellation petitions and ordered Reid to respond. When Reid failed to respond, the TTAB issued a default notice.

Before the TTAB issued default judgments, however, Reid and Salvador, acting on behalf of Crazy Horse Too, settled the dispute through a trademark co-existence agreement. Under this agreement, Crazy Horse Too promised to withdraw the cancellation petitions and "agree[d] not to oppose, petition to cancel, or otherwise interfere with Mr. Reid's use and registration of Crazy Horse and Pure Gold's Crazy Horse." In return, Reid consented to Crazy Horse Too's "use and registration" of "any mark that includes the phrase Crazy Horse provided the mark does not contain the phrase Pure Gold's."

Salvador dissolved the Crazy Horse Too corporation in April 2011. No longer making use of the Crazy Horse name, Salvador assigned his rights under the trademark co-existence agreement to Russell Road on August 16, 2012. Russell Road paid $2,500 for the assignment.

## B. Spencer's Claim to the Crazy Horse Name

In August 2010, Spencer formed Crazy Horse Consulting, Inc. ("CHC") to expand the Crazy Horse brand through licensing and franchising. In December of that year, Reid assigned his Crazy Horse trademark rights to CHC. The

USPTO recorded the assignment on January 11, 2011.[2]  To date, that trademark registration remains live.  *See* Crazy Horse, Registration No. 3044028.

## C.  The Dispute Between Russell Road and Spencer

In late 2011, Spencer learned that Russell Road was operating a Las Vegas strip club named Crazy Horse III. Spencer notified Russell Road that its club's name infringed his trademark rights and forwarded an application to license the use of the mark.  Instead of licensing the mark from Spencer, Russell Road entered into an assignment agreement with Salvador, acting on behalf of Crazy Horse Too, whereby Crazy Horse Too assigned Russell Road its rights under the September 2009 trademark co-existence agreement.

Having secured the rights granted under the co-existence agreement, Russell Road instituted this action, seeking a declaratory judgment that its use of the Crazy Horse name does not infringe Spencer and CHC's trademark.  The district court granted Russell Road's motion for summary judgment, holding that Russell Road's use of the Crazy Horse name does not infringe Spencer and CHC's trademark because the trademark co-existence agreement between Reid and Crazy Horse Too was valid, lawfully assigned to Russell Road, and binding on Spencer and CHC.  Spencer and CHC timely appealed.

---

[2] Around the same time, Reid assigned the Pure Gold's Crazy Horse trademark registration to JAT Investments, LLC ("JAT"), a company he managed.  Spencer, CHC, and JAT later entered into a trademark co-existence agreement under which JAT consented to Spencer's use and registration of the Crazy Horse mark, and Spencer and CHC consented to JAT's use and registration of the Pure Gold's Crazy Horse mark.

## II.

We review de novo the grant of summary judgment. *Millennium Labs., Inc. v. Ameritox, Ltd.*, 817 F.3d 1123, 1129 (9th Cir. 2016). Viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, we must determine whether there is a genuine dispute as to any material fact. *Id.*; Fed. R. Civ. P. 56(a).

## III.

It is beyond dispute that a trademark owner may assign his trademark. *See* 15 U.S.C. § 1060(a)(1) ("A registered mark . . . shall be assignable . . ."); *see also Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931, 941 (9th Cir. 2006) ("Indeed, it is not unusual for a troubled or failing business to sell and assign its trademark . . . ."); Restatement (Third) of Unfair Competition § 34 (1995) ("The owner of a trademark . . . may transfer ownership of the designation to another through an assignment."). When a trademark is assigned, "the assignee steps into the shoes of the assignor." *ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 325 F.3d 586, 593 (5th Cir. 2003) (citation omitted); *see also Carnival Brand Seafood Co. v. Carnival Brands, Inc.*, 187 F.3d 1307, 1310 (11th Cir. 1999); *Premier Dental Prods. Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 853 (3d Cir. 1986). The assignee therefore "acquires not only all the rights and priorities of the assignor, but also any burdens and limitations on use that were incumbent on the assignor." *ICEE*, 325 F.3d at 593 (quoting J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 18:15 (4th ed. 2002)); *see also Sun-Maid Raisin Growers of Cal. v. Cal. Packing Corp.*, 273 F.2d 282, 284 (9th Cir. 1959) ("The

assignment of the trademark did not in and of itself cause all rights under the contract and injunction to vanish magically as in a puff of smoke."); *Waukesha Hygeia Mineral Springs Co. v. Hygeia Sparkling Distilled Water Co.*, 63 F. 438, 442 (7th Cir. 1894) ("No larger claim can be maintained than was possessed by the source of title, and the right is subject to the same equities, abandonment, or estoppel which could be asserted against the vendor.").

It is also beyond dispute that trademark co-existence agreements are enforceable. *See Sun-Maid*, 273 F.2d at 283–84 (affirming an injunction enforcing an agreement to limit the use of the Sun-Maid mark to raisins and raisin products); *see also Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 579, 586 (3d Cir. 2009) (holding that the parties' agreement to consent to the registration of each other's eagle marks was a binding contract); *Bongrain Int'l (Am.) Corp. v. Delice de France, Inc.*, 811 F.2d 1479, 1484–85 (Fed. Cir. 1987) (assigning "great weight" to the parties' trademark co-existence agreement, "which would give both of them the advantages of registration"); *Waukesha Hygeia*, 63 F. at 441 (enforcing an agreement that "fixes and defines the existing trademark of each" party—one to the Hygeia mark in connection with distilled water, and the other in connection with natural mineral or spring water). And, like other contracts, trademark co-existence agreements are typically assignable. *See Britton v. Co-op Banking Grp.*, 4 F.3d 742, 746 (9th Cir. 1993) (citing Restatement (Second) of Contracts, § 317(1) (1981)) (discussing the standard for proving a valid assignment of rights).

Here, there is no genuine dispute of material fact as to the validity of the trademark co-existence agreement between Reid and Crazy Horse Too, or as to the validity of the

assignment of rights from Crazy Horse Too to Russell Road.[3] Under applicable state law, "a contractual right is assignable unless assignment materially changes the terms of the contract or the contract expressly precludes assignment." *Easton Bus. Opp. v. Town Exec. Suites*, 230 P.3d 827, 830 (Nev. 2010). Neither exception applies here: The terms of the trademark co-existence agreement did not materially change upon assignment. Russell Road obtained only the rights that Crazy Horse Too had possessed, while Spencer, CHC, and Crazy Horse Too retained the duties not to oppose each other's use of the Crazy Horse mark, to take reasonable steps to reduce the likelihood of confusion, and so on. Likewise, the agreement expressly provides that it "shall be binding upon and shall inure to the benefit of the parties hereto, their respective successors, *assigns* and licensees."

Spencer and CHC's other challenges to Russell Road's assignment are similarly unavailing. First, the uncontroverted record evidence is that Russell Road paid $2,500 to Crazy Horse Too in consideration for the assignment. Next, Crazy Horse Too's failure to use the mark, even if proven, did not invalidate the trademark co-existence agreement. The agreement did not require Crazy Horse Too to use the mark,

---

[3] Spencer and CHC argue that the district court abused its discretion by denying their request for additional discovery. But defendants failed to "identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment," as required to obtain more time for discovery under Federal Rule of Civil Procedure 56(d). *Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006) (discussing former Rule 56(f), which is now Rule 56(d)). Instead, they sought "all documents" and "all communications" to "investigate the validity of the Consent Agreement and Assignment Agreement." The district court properly denied that broad request.

and the doctrine of trademark abandonment does not apply. *See generally* 15 U.S.C. § 1115(b); *Electro Source*, 458 F.3d at 935. Finally, Spencer and CHC's remaining arguments—that the trademark co-existence agreement is an executory contract that cannot be assigned without the consent of both parties, and that Russell Road breached the agreement—were not raised before the district court and are therefore waived. *See Armstrong v. Brown*, 768 F.3d 975, 981 (9th Cir. 2014).

IV.

Because Russell Road obtained a valid assignment of an enforceable trademark co-existence agreement, its use of the Crazy Horse name did not infringe Spencer and CHC's registered trademark. Therefore, the district court properly granted summary judgment in favor of Russell Road.

**AFFIRMED.**