**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FRESH MIX, LLC, | No. 25-2462 |
| *Plaintiff - Appellant*, | D.C. No. 2:24-cv-00397-RFB-NJK |
| v. | |
| PISANELLI BICE, PLLC; JAMES J. PISANELLI Esquire, Attorney; DEBRA L. SPINELLI, Attorney; AVA MARIE SCHAEFER; COHEN DOWD QUIGLEY; RONALD J. COHEN; BETSY LAMM; Mr. DANIEL P. QUIGLEY Esquire, Attorney; JENNA BROWNLEE; BRUCE A. LESLIE, CHTD.; BRUCE A. LESLIE; BROWNSTEIN HYATT FARBER SCHRECK, LLP; Mr. SAMUEL A. SCHWARTZ Esquire, Attorney; SCHWARTZ LAW, PLLC; ZACHARIAH LARSON; LARSON & ZIRZOW, LLC, | ORDER CERTIFYING QUESTION TO THE NEVADA SUPREME COURT |
| *Defendants - Appellees*. | |

Filed May 28, 2026

Before: Marsha S. Berzon, Consuelo M. Callahan, and
Michelle T. Friedland, Circuit Judges.

## SUMMARY[*]

### Certification of Question to State Supreme Court

The panel certified to the Nevada Supreme Court the
following question of law:

> Under what circumstances, if any, does the
> transfer of majority ownership of a corporate
> entity effectuate a de facto assignment of the
> entity's legal malpractice claims in violation
> of Nevada public policy?

## ORDER

The dispositive issue in this appeal implicates an
important and open question of Nevada law: whether a
settlement of litigation between the majority and minority
owners of a limited liability company, through which the
minority owners received full ownership, functionally and
impermissibly assigned to them the company's legal
malpractice claims. Answering that question requires
determining how Nevada's public policies forbidding the
direct assignment of legal malpractice claims interact with

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

basic principles of corporate separateness. No precedent of the Nevada Supreme Court or Nevada Court of Appeals controls our resolution of this issue. Thus, we respectfully certify the following question of law to the Nevada Supreme Court under Nevada Rule of Appellate Procedure 5:

> Under what circumstances, if any, does the transfer of majority ownership of a corporate entity effectuate a de facto assignment of the entity's legal malpractice claims in violation of Nevada public policy?

Our phrasing of this question should not restrict the Nevada Supreme Court's consideration of the issues involved, and the court may rephrase the question as it sees fit. If the court agrees to decide this question, we agree to accept its decision. We recognize that the court has a substantial caseload, but we submit the question because of its significance to Nevada's public policies concerning the attorney-client relationship and to Nevada corporate law. *See Murray v. BEJ Mins., LLC*, 924 F.3d 1070, 1072 (9th Cir. 2019) (en banc); *Volvo Cars of N. Am., Inc. v. Ricci*, 137 P.3d 1161, 1163–64 (Nev. 2006). If the court declines to answer the question, we will decide this case under our best understanding of state law.

# I

This suit is the latest chapter in a yearslong saga of litigation.[1] As we recount in greater detail below, the

---

[1] This appeal comes to us on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). We therefore accept the operative complaint's well-pleaded allegations as true for purposes of this order. *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 875 (9th Cir. 2012). We also

plaintiff-appellant, Fresh Mix, LLC ("Fresh Mix"), alleges that the defendants-appellees, a litany of law firms and lawyers who formerly represented Fresh Mix, committed legal malpractice by scheming with the company's then-majority owner, Get Fresh Sales, Inc. ("GFSI"), to sabotage Fresh Mix's interests for GFSI's benefit. The defendants allegedly did so in several ways, including by jointly advising Fresh Mix and GFSI to take certain steps, to Fresh Mix's detriment, in state-court litigation against Fresh Mix's then-minority owners. At the zenith of the alleged scheme, the defendants conspired with GFSI to place Fresh Mix into a fraudulent involuntary bankruptcy.

Fresh Mix, its minority owners, and GFSI eventually agreed to settle their underlying disputes. As part of the settlement, GFSI ceded its ownership interest in Fresh Mix to the minority owners. Fresh Mix, now controlled by the former minority owners, seeks to recover against its former lawyers for malpractice.

## A

Fresh Mix is a Delaware limited liability company operating from Las Vegas. Fresh Mix was created in January 2010 as a joint venture between two companies: Lagudi Enterprises, LLC, which sells "value added food products" to Vegas hotels, casinos, and retailers, and GFSI, which sells whole produce to similar customers. Lagudi Enterprises founder Paul Lagudi owned a 30 percent interest in Fresh Mix; another individual, William Todd Ponder, owned a 10 percent interest. The two served as Fresh Mix's president and

recount certain of the parties' statements from other court filings, of which we can take judicial notice. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

chief operating officer, respectively, and they were also two of the company's five managers. GFSI held the remaining 60 percent ownership stake, and GFSI principals Dominic Caldara, Scott Goldberg, and John Wise (together, the "GFSI Managers") served as the remaining three managers. Fresh Mix's operating agreement required a 75 percent supermajority of ownership interest to approve certain decisions, including any actions that would place the company into bankruptcy. Accordingly, the GFSI Managers could not take those actions without obtaining approval from Lagudi. For other decisions, the GFSI Managers—as a majority of Fresh Mix's management group—had authority to run the company as they saw fit.

In 2017, the GFSI Managers began to explore selling their associated companies, including Fresh Mix. The GFSI Managers sought to diminish the value of Fresh Mix relative to other associated GFSI companies so they would receive more of the proceeds from any sale and Lagudi and Ponder would receive less. GFSI was allegedly able to misattribute sales and costs between Fresh Mix and other GFSI companies—attributing higher sales to the other companies and higher costs to Fresh Mix—to undervalue Fresh Mix. By spring 2018, Lagudi and Ponder were embroiled in a dispute with the GFSI Managers over Fresh Mix's value.

Fresh Mix's members and managers retained counsel. In March 2018, GFSI hired defendants-appellants Cohen Dowd Quigley PC and its attorneys Ronald J. Cohen, Betsy Lamm, Daniel P. Quigley, and Jenna Brownlee (together, "CDQ") to represent GFSI and Fresh Mix jointly. In April 2018, Goldberg hired defendants-appellants Bruce A. Leslie, Chtd. and its principal, Bruce A. Leslie (together, "Leslie"), who soon began jointly representing GFSI and the other GFSI Managers, and in late 2018 began representing Fresh Mix as

well. In November 2018, GFSI and Fresh Mix hired defendants-appellants Pisanelli Bice, PLLC, and its attorneys James J. Pisanelli, Debra L. Spinelli, and Ava Marie Schaefer (together, "Pisanelli Bice") to represent them jointly.

Despite settlement and mediation efforts, Lagudi and Ponder were unable to resolve their disputes with GFSI and the GFSI Managers. In November 2018, GFSI, through its control of Fresh Mix, fired Lagudi and Ponder from their Fresh Mix officer roles and locked them out of accessing company information. Lagudi and Ponder then sued Fresh Mix and GFSI in state court to regain access to Fresh Mix's systems and records, as they were still minority owners and managers of the company. Their suit included two claims against Fresh Mix for breach of the operating agreement.

Pisanelli Bice and Leslie jointly represented Fresh Mix and GFSI in the state-court action. In February 2019, invoking a provision of the operating agreement, Fresh Mix and GFSI moved to compel arbitration. The arbitration demand had been prepared by CDQ and Leslie; Fresh Mix alleges that the demand made false representations. In summer 2019, Lagudi and Ponder added derivative claims—on behalf of Fresh Mix and against GFSI and the GFSI Managers—to their pleadings in both state court and the arbitration. Lagudi and Ponder's amended complaint dropped the breach-of-contract claims against Fresh Mix but added a books-and-records demand against the company.

By the end of the year, seeking an advantage in the underlying dispute, CDQ, Pisanelli Bice, and Leslie allegedly began plotting with GFSI to place Fresh Mix into bankruptcy. They turned to defendants-appellants Samuel A. Schwartz and Brownstein Hyatt Farber Schreck LLP

("BHFS"), where Schwartz worked at the time. Schwartz was hired in December 2019 to represent GFSI and Fresh Mix jointly. He left BHFS in February 2020 and started his own firm, defendant-appellant Schwartz Law, PLLC, where he continued to represent Fresh Mix and GFSI.

To make Fresh Mix (which was then profitable) look insolvent, the lawyers advised GFSI to drain Fresh Mix's assets in several ways. First, in December 2019, the lawyers advised GFSI and the GFSI Managers to reimburse half of their ongoing legal fees from Fresh Mix's funds. Second, in March and April 2020, the lawyers advised the GFSI Managers to make a distribution of Fresh Mix's cash to the LLC's members. Such a distribution allegedly violated the operating agreement.

GFSI and the GFSI Managers followed through on both tactics. In April 2020, Goldberg, on behalf of GFSI, signed a petition to place Fresh Mix in involuntary Chapter 7 bankruptcy. A day later, this time on behalf of Fresh Mix, he made a cash distribution to the company's members of $2.3 million—everything Fresh Mix had in the bank. Schwartz, acting for GFSI, then promptly filed the involuntary bankruptcy petition. Schwartz also arranged for defendants-appellants Larson & Zirzow, LLC, and its attorney Zachariah Larson (together, "Larson") to represent Fresh Mix as debtor counsel. Larson allegedly did little to protect Fresh Mix's interests and instead took his lead from Schwartz and GFSI.

In February 2022, Pisanelli Bice, CDQ, and Leslie, apparently recognizing that they were conflicted, withdrew

as joint counsel for GFSI and Fresh Mix.[2] By then, the bankruptcy trustee had begun to pursue, among other things, claims against Fresh Mix's lawyers. He requested access to legal files held by Pisanelli Bice, CDQ, Leslie, BHFS, and Schwartz concerning their representations of Fresh Mix. The law firms resisted turning over the files. The bankruptcy court eventually ordered the firms to turn over their records to the trustee. In August 2022, the bankruptcy trustee, represented by Fresh Mix's current counsel, brought malpractice and other claims in state court against Pisanelli Bice, CDQ, and Leslie. The trustee voluntarily dismissed the suit without prejudice shortly after filing it.

In November 2023, the bankruptcy court issued an order to show cause why the bankruptcy should not be dismissed for abuse of process. The court expressed "significant concerns that the bankruptcy was improperly commenced solely by an insider based upon a disputed debt to disadvantage the minority members and obtain an advantage in the state court action and arbitration." Within two weeks of the court's order, on November 28, 2023, Lagudi, Ponder, Fresh Mix, GFSI, and the GFSI Managers agreed to settle their underlying dispute.

The settlement required GFSI to pay $25 million to Lagudi and Ponder and to transfer its ownership interest in Fresh Mix to the duo. As a result, Lagudi and Ponder became Fresh Mix's sole owners. GFSI also agreed to waive attorney-client privilege over communications with at least some of Fresh Mix's former lawyers. The agreement allowed Fresh Mix to retain all rights to pursue legal malpractice claims against those lawyers. Fresh Mix told the bankruptcy

---

[2] The complaint is not clear on when BHFS, Schwartz, and Larson withdrew from representing Fresh Mix.

court that "the claims against the attorneys were . . . the primary asset belonging to Fresh Mix."

Fresh Mix's former lawyers were upset by the settlement terms—presumably because it left them open to liability—but they were unable to persuade the bankruptcy court to block the agreement. The settlement was executed. In January 2024, the bankruptcy court dismissed the bankruptcy case for abuse of process.

## B

The next month, Fresh Mix commenced this action in district court. The operative, amended complaint contains seven claims relevant here: (1) aiding and abetting a breach of fiduciary duty—legal malpractice against all defendants; (2) legal malpractice against CDQ; (3) legal malpractice against Pisanelli Bice; (4) legal malpractice against Leslie; (5) legal malpractice against BHFS; (6) legal malpractice against Schwartz; and (7) legal malpractice against all defendants. These claims are based on allegations that the defendants acted contrary to Fresh Mix's rights and interests, including by commencing arbitration on behalf of Fresh Mix, appropriating Fresh Mix funds to cover legal services performed for GFSI, representing Fresh Mix and GFSI concurrently despite conflicting interests between the two entities, helping GFSI breach Fresh Mix's operating agreement, fraudulently manipulating Fresh Mix's assets to place it into bankruptcy, and abusing the bankruptcy process.[3]

---

[3] Fresh Mix does not appeal the dismissal of Counts 8 and 9, which were legal malpractice claims based on bankruptcy fraud. Fresh Mix does appeal the dismissal of Counts 10 through 13, which are federal and state racketeering claims, but they are not relevant to the certified question.

The district court held that the legal malpractice claims were barred under Nevada law. Recognizing that Nevada prohibits assignment of legal malpractice claims as a matter of public policy, the court concluded that Lagudi and Ponder's acquisition, through the settlement, of control over Fresh Mix constituted an impermissible, de facto assignment of Fresh Mix's claims. Accordingly, the district court dismissed the complaint in its entirety for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). Fresh Mix appealed.

## II

The outcome of this appeal turns on whether, by transferring Fresh Mix's ownership to Lagudi and Ponder, the settlement de facto assigned to them Fresh Mix's malpractice claims in violation of Nevada public policy. Nevada has a strong public policy against the direct assignment of legal malpractice claims or of proceeds from such claims. The defendants maintain that that public policy encompasses circumstances in which a party functionally gains control of a company's legal malpractice claim by gaining ownership of the company. Applying the policy here, however, would arguably compromise basic principles of corporate law by treating the retention of malpractice claims by the company whose ownership has changed as an assignment of the claims. To date, the Nevada Supreme Court has not ruled on an application of the public policy against the assignment of legal malpractice claims in such a context. Accordingly, we ask the Nevada Supreme Court to decide in the first instance whether the public policies barring assignment of legal malpractice claims justify dismissing the claims alleged here.

**A**

"Nevada is one of several jurisdictions that prohibits the assignability of certain causes of action, regardless of how the assignment is accomplished." *Reynolds v. Tufenkjian*, 461 P.3d 147, 150 (Nev. 2020). "[T]here are no prescribed formalities that must be observed to make an effective assignment" so long as the assignor manifests its intent to transfer control of the claim to the assignee. *Easton Bus. Opportunities, Inc. v. Town Exec. Suites*, 230 P.3d 827, 832 (Nev. 2010) (citation omitted); *see Tower Homes v. Heaton*, 377 P.3d 118, 122 (Nev. 2016) (explaining that "[w]hen an entire claim is assigned, a new party gains control over the case"). Thus, an assignment may be effective even if it does not use the term "assigned." *Tower Homes*, 377 P.3d at 123. Nor must an assignment be reduced to a signed writing. *Easton*, 230 P.3d at 832; *see also Reynolds*, 461 P.3d at 150 n.1 (holding that an assignment does not require payment of consideration); *Chaffee v. Smith*, 645 P.2d 966, 966 (Nev. 1982) (per curiam) (holding that the acquisition of a cause of action by levy or execution sale was an assignment).

A legal malpractice claim is one such unassignable cause of action. *Tower Homes*, 377 P.3d at 121–22. The policy considerations justifying this rule include "the unique quality of legal services, the personal nature of the attorney's duty to the client and the confidentiality of the attorney-client relationship." *Id.* at 123 (quoting *Goodley v. Wank & Wank, Inc.*, 62 Cal. App. 3d 389, 397 (1976)). Because "[t]he decision as to whether to bring a malpractice action against an attorney is one peculiarly vested in the client," *id.* at 121 (quoting *Chaffee*, 645 P.2d at 966), "an assignment of a legal malpractice claim violates public policy because the assignor no longer controls the claim," *Beavor v. Tomsheck*, 519 P.3d 1260, 1262 (Nev. 2022).

These policy concerns are magnified by the assignment of a legal malpractice claim, or its proceeds, "to an adversary in the same litigation that gave rise to the alleged malpractice." *Id.* at 1263 (quoting *Gurski v. Rosenblum & Filan, LLC*, 885 A.2d 163, 167 (Conn. 2005)). An assignment to such an adversary "creates the opportunity and incentive for collusion in stipulating to damages in exchange for an agreement not to execute on the judgment in the underlying litigation." *Id.* (quoting *Gurski*, 885 A.2d at 174). Similarly, such an assignment "carries the risk that the malpractice claim will be used to settle a client's case." *Id.* (citing *Picadilly, Inc. v. Raikos*, 582 N.E.2d 338, 343 (Ind. 1991), *abrogated on other grounds by Liggett v. Young*, 877 N.E.2d 178 (Ind. 2007)). The potential for malpractice claims to be used as negotiating tools would "undermine attorney-client relationships and confidences" and turn such claims "into a 'commodity to be exploited,' which would encourage unjustified lawsuits against attorneys, increase legal malpractice litigation, and ultimately debase the legal profession." *Id.* (quoting *Goodley*, 62 Cal. App. 3d at 397). Accordingly, public policy prohibits giving a litigation adversary "an interest in any recovery from the legal malpractice claim." *Id.* at 1264.

A legal malpractice claim is not automatically extinguished when it is invalidly assigned. *Id.* Rather, the assignment is set aside, and the injured client retains his or her own right to pursue the claim. *Id.* at 1264–65. An invalid assignment thus generally "does not warrant dismissal of the legal malpractice claim." *Id.* at 1265.

## B

Those settled principles of Nevada law arguably do not apply here. As the parties agree, no traditional assignment

occurred. The same entity—Fresh Mix—held and continues to hold the legal malpractice claims. The defendants instead contend, and the district court held, that the transfer of majority ownership of Fresh Mix from GFSI to Lagudi and Ponder constituted a "de facto" assignment of those claims in violation of Nevada public policy. No reported Nevada appellate decision addresses such circumstances.

The defendants rely primarily on *Oceania Insurance Corp. v. Cogan*, No. 74958-COA, 2020 WL 832742 (Nev. Ct. App. Feb. 19, 2020), in which a divided panel of the Nevada Court of Appeals, in an unpublished opinion, held that the transfer of ownership of a corporation to its former litigation adversary effectuated an impermissible, de facto assignment of the corporation's legal malpractice claim. *Id.* at *2–3. The court therefore granted the defendant attorney's motion to dismiss the claim. *Id.* at *3. The Nevada Supreme Court denied the petition for review by a vote of 4–2, with Justices Pickering and Stiglich dissenting. Order Denying Petition for Review, *Oceania Ins. Corp. v. Cogan*, No. 74958 (Nev. June 4, 2020).

We would find *Oceania* more helpful if it were precedential, but it is not. *See* Nev. R. App. P. 36(c)(2), (3). And its dissent raises substantial concerns about the holding's implications for corporate separateness. Given these concerns, we seek the Nevada Supreme Court's guidance on when, if ever, a transfer of ownership of a corporate entity implicates the public policies against assignment of that entity's legal malpractice claims.

In *Oceania*, Oceania sued its former lawyer, Cogan, for alleged malpractice arising from his deficient defense of the corporation in a federal suit brought by another company, Alutiiq. 2020 WL 832742, at *1. Alutiiq had gained control

of Oceania as a result of the suit. *Id.* The *Oceania* majority held that allowing Oceania to bring the malpractice claim in its own name while being controlled by Alutiiq would violate two of the public policies forbidding express assignment of legal malpractice claims. *Id.* at *2. First, Alutiiq's effective control of Oceania's malpractice suit would lead to "position shifting," which would "give prominence (and substance) to the perception that lawyers will take any position, depending upon where the money lies, and that litigation is a mere game and not a search for truth, thereby demeaning the legal profession." *Id.* (quoting *Kommavongsa v. Haskell*, 67 P.3d 1068, 1078 (Wash. 2003)). Because Oceania and Alutiiq had been litigation adversaries when the alleged malpractice arose, Oceania could not recover against Cogan without "showing that [it] would have prevailed or at least obtained a better result in the prior case if not for the attorney's malpractice." *Id.* Effectively, then, Alutiiq (as the controlling owner of Oceania) would "have to take the position that it should not have prevailed in the underlying action in federal court, even though its victory in federal court is why it is in the position of being the majority shareholder of Oceania and being involved in this action in the first place." *Id.*

Second, allowing an entity's former adversary to control the entity's legal malpractice claim would create an "opportunity for collusion" and lead to a "transformation of legal malpractice to a commodity." *Id.* (quoting *Kenco Enters. Nw., LLC v. Wiese*, 291 P.3d 261, 263 (Wash. Ct. App. 2013)). The risk of collusion was apparent in *Oceania* because "the legal malpractice claim [wa]s Oceania's only asset, meaning that Oceania must prevail on the claim for Alutiiq to have gained any benefit by acquiring a stake in the company." *Id.* at *2 n.4.

The majority recognized that "corporate entities generally retain their causes of action following a change in ownership" and that a corporation's identity is distinct from that of its owners. *Id.* at *3. But, it ultimately concluded, even though "Alutiiq's control over this litigation stem[med] from its ownership interest in Oceania rather than from a direct assignment of the legal malpractice claim[,] . . . the transfer of ownership to Alutiiq nevertheless constituted a de facto assignment of the claim" in violation of public policy. *Id.* at *2.

The dissenting judge would not have dismissed the claim, for three reasons relevant here:

First, the dissent maintained, dismissal was "premature" because it was not possible to tell, at the pleading stage, whether a conflict would actually arise if Oceania's former lawyer were required to defend against the claim. *Id.* at *5 (Tao, J., dissenting).

Second, the dissent argued, by conditioning Oceania's right to bring a legal malpractice claim on the identity of its controlling owner, the majority "violate[d] fundamental principles of corporate law by intertwining the corporation's rights with those of its shareholders, in something very much akin to an 'alter ego' or 'piercing the corporate veil' analysis, without such a claim having been made." *Id.* at *6.

Third, the dissent worried that the majority's reasoning could prevent *any* entity from bringing the malpractice claim against Oceania's former lawyer. As the dissent explained, *id.* at *7, and the Nevada Supreme Court subsequently held in *Beavor*, an invalidly assigned legal malpractice claim is not extinguished but rather reverts to the injured client, *Beavor*, 519 P.3d at 1264–65. Yet under *Oceania*'s holding,

the injured client itself—Oceania—was barred from bringing the claim.

## C

Allowing Fresh Mix to pursue legal malpractice claims here could implicate the public policies invoked by the *Oceania* majority. The circumstances suggest that Fresh Mix's claims may have been used as a "bargaining chip" to settle the underlying litigation and arbitration between Lagudi and Ponder on one side and Fresh Mix, GFSI, and the GFSI Managers on the other side. *Beavor*, 519 P.3d at 1264. The settlement provided that Fresh Mix would "retain[] all rights to pursue its prior counsel for the malpractice claims and bad faith sanctions claims that mature with the conclusion of the arbitration and state court matters and the dismissal of the involuntary petition." The settlement also required GFSI to waive attorney-client privilege with respect to various defendants here. And by the time the settlement was executed, "the claims against the attorneys were . . . the primary asset belonging to Fresh Mix." So, as in *Oceania*, Lagudi and Ponder "must prevail on the claim[s] . . . to have gained any benefit by acquiring a stake in the company." 2020 WL 832742, at *2 n.4.

The change in control also means that Fresh Mix has reversed its position as to actions taken by its former counsel during that litigation—actions such as demanding arbitration, arguing that Fresh Mix had little value, advising Fresh Mix to reimburse GFSI's legal fees and to make allegedly improper distributions, adopting certain legal positions in court, and otherwise "coordinat[ing] and manag[ing] the legal affairs of Fresh Mix." Fresh Mix now argues that these actions, undertaken at Fresh Mix's direction, were fraudulent and wrongful.

At the same time, the *Oceania* dissent's concerns are sufficiently substantial to cause us to hesitate to follow the majority's holding without guidance from the Nevada Supreme Court. Most importantly, treating Fresh Mix's legal malpractice claims as having been de facto assigned to Lagudi and Ponder—without requiring the defendants to show that Fresh Mix is their alter ego—would be inconsistent with basic corporate law principles. Usually, the fact that "a corporation undergoes a change in shareholders has no effect on the ongoing legal status of the corporation itself." 2020 WL 832742, at *6 (Tao, J., dissenting). That is because "a corporation is a separate entity from its shareholders[,] and the corporation's rights do not depend upon who holds its stock." *Id.* at *8. Indeed, Nevada law has long "recognized that a corporation should be treated as a separate legal entity unless the corporate veil is pierced and the corporation is shown to be the alter ego of a controlling individual." *Cap. Advisors, LLC v. Cai*, 548 P.3d 1202, 1206 (Nev. 2024); *see, e.g.*, *Ene v. Graham*, 546 P.3d 1232, 1236 (Nev. 2024) (noting that LLCs and "corporations are generally to be treated as separate legal entities" from the individuals controlling them (quoting *LFC Mktg. Grp., Inc. v. Loomis*, 8 P.3d 841, 845 (Nev. 2000))); *Canarelli v. Dist. Ct.*, 265 P.3d 673, 677 (Nev. 2011) (noting that "a corporation is a legal entity that exists separate and distinct from its shareholders, officers, and directors" (quoting *Willmschen v. Trinity Lakes Improvement*, 840 N.E.2d 1275, 1280 (Ill. App. Ct. 2005))); Nev. Rev. Stat. § 86.381 ("A member of a limited-liability company is not a proper party to proceedings by or against the company, except where the object is to enforce the member's right against or liability to the company.").

Further, the bankruptcy context may be of significance here. Assuming Fresh Mix's legal malpractice claims were at one point effectively controlled by its majority owner, GFSI, that assumption could not survive the bankruptcy filing. GFSI placed Fresh Mix into an involuntary bankruptcy, as a creditor. GFSI was thus directly adverse to Fresh Mix, the debtor, in the bankruptcy proceeding. *See* 11 U.S.C. § 303. At that point, control of Fresh Mix's legal malpractice claims transferred to the bankruptcy trustee. *See* 11 U.S.C. § 541(a); *Tower Homes*, 377 P.3d at 121–22. And the trustee did bring (but later voluntarily dismissed) those claims against certain of the defendants here. Only after the bankruptcy was dismissed did control of those claims return to Fresh Mix, at which juncture Lagudi and Ponder owned the entire company. This case thus raises questions concerning what role, if any, attorney conflict during the underlying litigation and a bankruptcy trustee's intervening control of the malpractice claims should play in the de facto assignment analysis.

In addition, barring Fresh Mix from bringing legal malpractice claims against its former attorneys would create substantial tension with *Beavor*'s holding that "a legal malpractice claim is vested in the client, and an invalid assignment, by itself, does not prevent an injured client from pursuing a legal malpractice claim where the assignment has been set aside." 519 P.3d at 1265. As the *Oceania* dissent explained, a rule that prevents both the allegedly injured corporate entity and its controlling owner from asserting the entity's legal malpractice claims could allow "attorneys who committed real malpractice [to] get away scot-free, all just because the corporation's stock happened to change hands at some point in time after the malpractice." 2020 WL 832742, at *7.

This concern may be particularly salient here because the basis for the alleged malpractice is that the defendants breached their duty of loyalty to Fresh Mix for GFSI's benefit. Underlying the policies against assignment of legal malpractice claims is the notion that "the decision as to whether to bring a malpractice action against an attorney is one peculiarly vested in the client." *Beavor*, 519 P.3d at 1262 (citation modified). When a malpractice claim arises from an alleged breach of the attorney's duty of care, as in *Oceania*, *see* 2020 WL 832742, at *1, the original client ordinarily had a chance to decide whether to seek redress against the attorney. That was not the case here. Because the defendants' alleged breach of loyalty to Fresh Mix was to benefit GFSI, there was no chance that Fresh Mix would bring malpractice claims while it was still controlled by GFSI. Only after GFSI lost control of Fresh Mix (first to the bankruptcy trustee and then, upon settlement, to Lagudi and Ponder) could Fresh Mix bring claims for breach of the duty of loyalty. Barring those claims due to the transfer of Fresh Mix's ownership could effectively allow alleged attorney misconduct to go unchecked.

## D

The defendants point to a handful of decisions from other jurisdictions applying the public policies against assignment of legal malpractice claims to bar a de facto assignment resulting from the transfer of ownership of the corporate entity holding the claim. *See Duro, Inc. v. Walton*, 43 F.4th 648, 653–54 (7th Cir. 2022); *Kenco*, 291 P.3d at 263–64; *Paonia Res., LLC v. Bingham Greenebaum Doll, LLP*, No. 14-cv-95, 2015 WL 7431041, at *3–4 (W.D. Ky. Nov. 20, 2015); *see also Trinity Mortg. Cos. v. Dryer*, 451 F. App'x 776, 779 (10th Cir. 2011). One of these decisions, *Duro*, noted that the policies against assignment would not apply if

ownership of the entity holding the legal malpractice claim had transferred through an ordinary corporate merger or acquisition rather than through an apparently collusive settlement. 43 F.4th at 655. *Duro*, which predicted Indiana law, did not grapple with the competing policies in favor of respecting corporate formalities. Quite the opposite: It deemed the entity holding the malpractice claim an "alter ego" of the entity's owner without analyzing whether the corporate veil should be pierced under the applicable state law governing such determinations. *Id.* at 653. The other decisions cited above also do not attempt to harmonize their reasoning with corporate law principles. Nor do these decisions shed light on how the Nevada Supreme Court would decide this issue.

\*          \*          \*

At bottom, this case turns on the proper understanding of Nevada's public policies underlying the judge-created bar on transferring legal malpractice claims, as well as on Nevada corporate law. We seek guidance on how to balance the state's customary respect for corporate formalities with its policy against assignment of legal malpractice claims. If these policies may justify barring an entity from asserting legal malpractice claims after a change in the entity's ownership, we also seek guidance on how to apply the policies to the allegations here.[4]

---

[4] As already noted, this appeal comes to us on a motion to dismiss. If facts beyond those alleged in the complaint and those judicially noticeable are needed to determine whether the public policies against assignment of legal malpractice claims apply to bar the claims here, we (and the district court and parties) would benefit from guidance as to what facts may be relevant should the claims proceed to discovery.

## III

For the foregoing reasons, we respectfully ask the Nevada Supreme Court to accept the question certified in this order. The appendix to this order contains the party designations and names and addresses of counsel. *See* Nev. R. App. P. 5(c)(4), (5). The clerk of this court shall promptly transmit to the Nevada Supreme Court, under official seal of the Ninth Circuit, a copy of this order and request for certification, as well as all relevant briefs and excerpts of record.

Further proceedings in this court are stayed, and submission of this case is withdrawn, pending the Nevada Supreme Court's decision whether to accept the certified question and, if so, the receipt of its answer to that question. The clerk shall administratively close this docket pending further order. This case will be resubmitted after receiving either notice that the Nevada Supreme Court has declined to answer the certified question or its opinion answering the question. The panel shall retain jurisdiction over further proceedings in this court.

The parties shall notify the clerk of this court within seven days of the Nevada Supreme Court's decision to accept or decline certification. If the Nevada Supreme Court grants certification, the parties shall notify the clerk within seven days after the court issues its opinion on the certified question.

**QUESTION CERTIFIED; PROCEEDINGS STAYED.**

## APPENDIX

For Plaintiff-Appellant Fresh Mix, LLC:

>   Steven K. Eisenberg
>   Stern & Eisenberg, PC
>   1581 Main Street
>   Suite 200
>   Warrington, PA 18976
>
>   Matthew L. Sharp
>   Matthew L. Sharp, Ltd.
>   432 Ridge Street
>   Reno, NV 89501

For Defendants-Respondents Pisanelli Bice, PLLC; James J. Pisanelli; Debra L. Spinelli; Ava Marie Schaefer:

>   Philip Erwin
>   Samuel R. Mirkovich
>   Campbell & Williams
>   710 S. 7th Street
>   Suite A
>   Las Vegas, NV 89101

For Defendants-Respondents Cohen Dowd Quigley; Ronald J. Cohen; Betsy Lamm; Daniel P. Quigley; Jenna Brownlee:

>   J. Randall Jones
>   Joseph Laurita
>   Nathanael Rulis
>   Kemp Jones, LLP

3800 Howard Hughes Parkway
17th Floor
Las Vegas, NV 89169

For Defendants-Respondents Bruce A. Leslie, Chtd.; Bruce
A. Leslie:

Troy Rackham
Spencer Fane, LLP
1700 Lincoln Street
Suite 2000
Denver, CO 80203

John Mowbray
Spencer Fane, LLP
300 S 4th Street
Suite 1600
Las Vegas, NV 89101

Keith Anson Call
Spencer Fane, LLP
10 Exchange Place
11th Floor
Salt Lake City, UT 84111

For Defendant-Respondent Brownstein Hyatt Farber
Schreck, LLP:

Joshua P. Gilmore
Dennis L. Kennedy
Joshua M. Dickey
Bailey Kennedy, LLP
8984 Spanish Ridge Avenue

Las Vegas, NV 89148-1302

For Defendants-Respondents Schwartz Law, PLLC;
Samuel A. Schwartz:

> I. Scott Bogatz
> Reid Rubinstein & Bogatz
> 300 S. 4th Street
> Suite 830
> Las Vegas, NV 89101
>
> Charles M. Vlasic, III
> Hayes Wakayama Juan
> 5798 S Durango Drive
> Suite 105
> Las Vegas, NV 89113

For Defendants-Respondents Larson & Zirzow, LLC;
Zachariah Larson:

> Sheri Michele Thome
> Nicholas Adams
> Wilson Elser Moskowitz Edelman & Dicker, LLP
> 6689 Las Vegas Boulevard, S
> Suite 200
> Las Vegas, NV 89119